## THE ARLINGTON.

Circuit Court of Appeals, Second Circuit.
May 2, 1927.

No. 265.

1. Towage ⬤➞11(8)—Tug master is not liable for injuries on grounding tow on uncharted and unknown rock.

Tug master is not liable for injuries caused by grounding his tow on an uncharted and unknown rock in fairway.

2. Towage ⬤➞15(2)—Tug owner has burden of showing injury resulted from grounding tow on uncharted and unknown rock.

Tug master has burden of showing that injuries were caused by grounding tow on uncharted and unknown rock in fairway, since prima facie he is at fault for such injuries.

3. Towage ⬤➞11(1)—Tug owner, voluntarily leaving "channel" with tow, does so at his peril.

Tug owner, voluntarily leaving channel, does so at his peril, though rock or shoal causing injury to tow be both uncharted and unknown, and "channel" in such cases means customary and traveled fairway for craft of description in question.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Channel.]

4. Towage ⬤➞11(8)—Tug held liable for damages caused by barge striking uncharted ledge while attempting to moor at private wharf during fog.

Where damage to cargo of grain on barge resulted from striking uncharted ledge, when tug was attempting to moor alongside private wharf during fog, through approaches with which master was unfamiliar, the tug was liable therefor, in view of evidence showing that stress of circumstances did not require mooring at such particular wharf.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by the Continental Grain Company against the steam tug Arlington. From a decree in admiralty, dismissing a libel in rem for damages sustained by a cargo of grain laden on the barge Saratoga, while in tow of the tug Arlington, libelant appeals. Reversed, with directions.

Barry, Wainwright, Thacher & Symmers, of New York City (John C. Crawley and James K. Symmers, both of New York City, on the brief), for appellant.

Bigham, Englar & Jones, of New York City (Leonard J. Matteson and Richard F. Shaw, both of New York City, on the brief), for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge. The barge, Saratoga, was in tow of the tug, Arlington, bound down the Hudson river between Esopus and Poughkeepsie on October 15, 1924. The tow was made up of five grain-laden barges, three in the first and two in the second tier, the Saratoga being the port hawser boat. After leaving Esopus Point the weather, which had theretofore been hazy, though proper for navigation, became thicker, so that the master thought it unsafe to proceed. His reason for this was that at Poughkeepsie he must upon an ebb tide pass between the piers of the railroad bridge which crosses the river at that place, with a flotilla whose total length was over 400 feet. In this we think that his judgment was right; indeed we do not understand it to be challenged by the libelant.

The possible courses open to him were to tie up to a wharf, or to turn about and stem the ebb till the fog lifted. There was a wharf on the west shore of the river at the Columbia boat house between 2 and 3 miles above the bridge, but, as he was nearer the easterly shore, and there were usually small boats in numbers near this wharf, he thought this a dangerous alternative, a decision which we may also pass without condemnation. Within the limits of the city of Poughkeepsie was a large wharf of the Dutton Lumber Company to which, if clear, he might have safely moored, but as it was apt to be occupied by steamers or other craft he feared that, if he got down so far, it would be too late with so long a tow to turn and lie in the current.

In this predicament he chose to turn to the east shore and moor alongside a wharf used by the New York Insane Asylum about a mile and a half above the bridge. This was not a public wharf, and its approaches were not generally known to river men, though such as were acquainted with them knew them to be difficult. The respondent argues that the only masters familiar with these dangers got their information while in charge of tender tugs, whose duties required them to drop off barges from flotillas moving up and down. Assuming that the Arlington's master was not chargeable with so much specialized knowledge, the fact at best remains that the approaches to the wharf were unknown.

Upon nearing this wharf, the Arlington stationed a deckhand forward to sound with a pike pole. This of course gave no information of any rocks which might lie on either side of the tug, and the Saratoga, being the inshore boat in the first tier, struck

and hung upon an uncharted ledge about 150 feet off the wharf, suffering the injuries complained of. This ledge was about 9 feet below water, and was outside the channel commonly used by tows in the river. The District Court exonerated the tug because the ledge was not charted, accepting the master's excuse for seeking the wharf because of stress of weather.

[1-3] It is of course well established that a tug-master is not liable for injuries caused by grounding his tow upon an uncharted and unknown rock in the fairway, Lehigh Valley Transp. Co. v. Knickerbocker Steam Towage Co., 212 F. 708 (C. C. A. 2); The Nathan Hale, 99 F. 460 (C. C. A. 2); but he has the burden of so showing, The Wyomissing, 228 F. 186 (C. C. A. 2), because prima facie he is at fault. Moreover, if he voluntarily leaves the channel he does so at his peril, though the rock or shoal be both uncharted and unknown. The S. W. Morris (D. C.) 59 F. 616, The Nathan Hale, supra. This is all well-recognized law, and is not disputed. The channel in such cases means the customary and traveled fairway for craft of the description in question, since that alone can become known by repeated traverse. The Mascot (D. C.) 48 F. 917. As nobody asserts that the customary channel came within 150 feet of the shore, the Arlington was at fault unless she can show some excuse for taking the chance which she did.

[4] While we recognize the latitude of choice which must be given to masters caught in a fog, plainly there are limits. The occasion was not one in which it was necessary at all costs to seek the shore. Taking the situation quite as the master describes it, we see no impropriety in his turning about and stemming the ebb till the fog lifted. The suggestion that this would have been dangerous seems to us without substance. The locus was not shown to be greatly frequented at that season, and such vessels as might be similarly caught would presumably either remain where they were, or move slowly. Another tow, just above the Arlington, successfully rode out the fog.

At any rate, dangerous or not, we cannot agree that it was prudent to seek a wharf whose approaches the tug did not know, except that it was used only for private purposes. That this implied a safe entrance somehow was indeed inevitable, but this the master did not know how to find, and he had not the slightest warrant for supposing that the wharf was generally approachable from any direction. The stress of circumstance pressed him to no such alternative.

We decline at this stage of the case to consider the quantum of damages.

Decree reversed and interlocutory decree directed for the libelant.