## THE HENRY E.

## THE WRESTLER.

## EXNER SAND & GRAVEL CORPORATION v. GALLAGHER BROS. SAND & GRAV-EL CORPORATION.

### Petition of STEVENS.

### Nos. A–17084, A–17125.

District Court, E. D. New York.

April 12, 1945.

See, also, 58 F.Supp. 271.

Purdy & Lamb, of New York City (Edmund F. Lamb and Thomas J. Irving, both of New York City, of counsel), for Exner Sand & Gravel Corporation.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for Gallagher Bros. Sand & Gravel Corporation.

Krisel & Beck, of New York City, for petitioner Stanley Stevens.

BYERS, District Judge.

Cause A–17084 was consolidated with A–17125, a limitation proceeding instituted by the owner of the tug Wrestler, and the issue of negligence on the part of the tug is the sole question for decision.

On February 16, 1944, the sand scow Henry E, owned by the libelant and then being under charter to Gallagher Brothers Sand & Gravel Corporation, while being towed in the Rahway River in New Jersey by the tug Wrestler (hired by Gallagher) fetched up on a rock in the river bed and later sank. To recover for the damage so occasioned, the libel was filed on May 18, 1944, in cause A–17084 by the owner of the scow against the charterer, for failure to redeliver her in as good condition, etc.

The answer alleged that the damage was due to the negligent navigation of the scow while in tow of the Wrestler, and that the

owner of the latter had initiated a limitation proceeding, whereby an impleading petition was rendered unavailable.

In the limitation proceeding, exoneration was sought by Stevens, the owner and navigator of the tug, because the scow was said to have struck an unknown and uncharted rock lying in the bed of said Rahway River.

The Rahway River is in effect a creek which empties into the Arthur Kill, and it has not been charted by the United States Coast and Geodetical Survey. Nevertheless, boats had been towed up to Lambert's Wharf, Linden, N. J. (the destination of this scow) for a number of years, mostly scows and barges, drawing as much as ten feet when loaded; while care is required in the conduct of such navigation, it is not necessarily hazardous, when it involves vessels of that draft, at or just prior to flood tide. The testimony is convincing that it is customary for towing vessels to wait at the mouth of the stream until about an hour or more before high water, and then to proceed, provided (a) that the surface has risen to the third plank from the top of the parapet supporting the first railroad bridge to be encountered as the tow moves upstream, and (b) that strong westerly winds have not prevailed for more than one previous day to keep the tide from rising to its customary level.

The evidence in the cause yields the following factual summary:

(1) Ownership and operation of the respective vessels are found to be as alleged in the respective pleadings.

(2) On February 15, 1944, the scow Henry E was under the customary New York harbor charter by the owner, Exner Sand & Gravel Corporation, to Gallagher Brothers Sand & Gravel Corporation.

(3) The dimensions of the vessels involved were:

(a) Sand scow Henry E, 116.8 feet by 34.1 feet by 9 foot depth of sides.

(b) Diesel tug Wrestler, 42.8 feet by 12 feet by 5.2 foot depth of sides, with indicated horse power of 120.

(4) On February 15, 1944, the tug, being operated by her owner, Stanley Stevens (the petitioner seeking exoneration), took the scow in tow stern first on a bridle hawser so rigged that there was a 15-foot space between the stern of the tug and the forward end of the scow; the latter was partly loaded with sand, and drew 8 feet.

(5) At about 11:30 A.M. on that day, the tow as so made up entered the Rahway River; and when it had proceeded about 1½ miles so that the scow was about 75 or 100 feet upstream of the second railroad bridge, the scow stranded in the channel as customarily understood, but which is uncharted, at about 1 P.M., when high tide occurred in that part of the river.

(6) At the place of said stranding, the Rahway River is about 350 feet wide from bank to bank, measured at the surface of the river at high water, and the channel as used is about 200 feet wide generally in the center but inclining to the northerly bank of the river. At other reaches the channel is as little as 75 feet wide.

(7) The said river runs generally from east to west, and follows a bending course, and the tow was proceeding in a westerly direction, with the north bank of the river on its starboard hand.

(8) Normal high water in the Rahway River is about 4 to 4½ feet above mean low water.

(9) During the 24 hours ending at midnight of February 15th, the wind was blowing from the SW, W.SW, W, with a force rising at about 2:40 A.M. to 25 miles; and then to 33 at 11:30 A.M., and continuing in that range until 10:30 P.M. On February 14th, beginning at about 3 P.M., the wind had been in the E, NE, E.NE, S.SE, SE and again E, with a velocity rising from 3 to 25 miles, with fresh and at times strong gusts, to midnight.

(10) The effect of a westerly wind of the force shown was to oppose the flood-tide moving into the river from the Kill, and thus to prevent it from reaching its normal height.

(11) Actual high water in the Rahway River was at about 2 A.M. on February 16, 1944, and it was lower than its predicted level by from 1.9 feet to 2.3 feet.

(12) Between 11.50 P.M. on February 15th and 12:30 A.M. on February 16th, the scow was released from the first strand by reason of the rising tide, and the tow proceeded up the river, in the said channel.

(13) At the end of approximately seven minutes and after it had covered a distance of approximately 600 feet, the scow struck a submerged rock lying in that portion of the bed of the Rahway River which constitutes the channel as used, nearer to the northerly shore than to the center, upon which the scow rested and from

which it could not be moved; the rock caused a gouge in the bottom of the scow, and certain bottom planks were damaged, causing the vessel to make water so fast that eventually she sank.

(14) The said rock was pyramidal in shape and from 4 to 6 feet in diameter at the base, having an apex on the upstream side rising approximately 3½ feet from the bed of the river; on the downstream side, the rock sloped gradually for a distance of approximately 7 feet, tapering down to a base which was approximately one foot above the river bed; the rock was serrated, and pieces of it could be scaled off, and an examination of the fragments of its surface proved them to be oyster shells.

(15) Rahway River is not shown upon any chart issued by the United States Coast and Geodetical Survey.

(16) Soundings of the Rahway River, approaching the rock from east to west in a 100-foot strip centered upon the rock, show an inshore depth of 6.5 feet and an outshore depth of 7.7 feet at mean low water, as at the time of this second stranding.

(17) The stern mud log, which struck the rock, showed that the point of impact was 27.1 feet from the inshore side of the scow, and at that side there would have been a depth of 7.4 feet at mean low water.

(18) The tide had risen 1½ feet at 12:15 A.M. of February 16th, above mean low water.

(19) There was a depth of water of not less than 8.9 feet at this place, except for the rock.

(20) The said rock was not shown upon any chart, nor was its presence known to the navigator of the tug Wrestler, nor to the two experienced navigators of other tugs who testified in this cause.

(21) As the Wrestler proceeded with the scow after the first stranding, a deckhand from the tug, stationed on the scow, took soundings from time to time, and found depths of 9 and 10 feet until the impact of the scow upon the said rock.

(22) The navigator of the Wrestler during the six months preceding this disaster had previously towed not less than forty-five similar vessels up the Rahway River to said Lambert's Wharf with no incidents save an occasional stranding in shallow portions of the river, which are not shown to have caused damage.

(23) The navigator of the Wrestler was competent, and was not guilty of negligence in failing to know of the presence of the said rock.

Under the foregoing facts it will be seen that the argument relied upon to demonstrate failure on the part of the tug to meet the burden of exculpating explanation arising from the fact of stranding the tow (The Arlington, 2 Cir., 19 F.2d 285, 54 A. L.R. 101. The Reichert Line, 2 Cir., 64 F. 2d 13, and cases therein cited) is to the effect that the tug was negligent primarily in taking the tow into the Rahway River at all on February 15th since the requisite tidal conditions for safe passage were not to be apprehended under the known conditions of wind. This main contention is of a kind of delayed action type of negligence, since the first stranding did not cause any damage, because it was the cause of detention at a time of high water which was in fact lower by 2.1 feet than would have been the case if the tide had then attained its predicted height of 4.2 feet above mean low.

Incidentally, a rise of 3.5 feet above mean low water on February 15th would have enabled the scow to pass safely over this rock, which means that the failure of the tide to reach its expected level, if reasonably to have been anticipated, cannot be relied upon to demonstrate that the tug was operated with the requisite skill of her calling.

■ It seems that this becomes the decisive aspect of the case, since neither reason nor authority charges the tug with knowledge of a rock in the bed of the channel as frequented by all vessels plying these waters, which was uncharted and unknown in fact to Stevens, or to the only other navigators who testified, and whose experience was much greater and more comprehensive than his.

It is urged by the barge owner that the tug must be held to the same measure of responsibility as though the navigation had been conducted outside the channel lines, as in The Arlington, supra, apparently upon the theory that ignorance of expectable tidal conditions is roughly equivalent to the departure beyond channel lines, and should visit the same measure of responsibility upon the tug which offends in that respect.

That contention is probably based upon the following language in White v. Upper Hudson Stone Co., 2 Cir., 248 F. 893, 895,

where it is said in speaking of the motor boat that did the towing: "She assumed the ordinary obligation of a towing vessel; inter alia, to know the recognized channel, the tides, the draft of the tow, and with reasonable skill to judge the weather." That expression must be understood, of course, in connection with the facts that gave rise to it.

Stevens, the navigator of this tug Wrestler, showed that he met the first and third requirements (the fourth is unimportant here), and the second, the tides, in a general way; he did not demonstrate that he appreciated the necessity for calculating an allowance for the effect of the westerly winds which had prevailed for nearly twelve hours before he entered the river on the 15th, nor did he claim to have estimated the probable effect of that condition as opposed to the easterly winds which had been effective for about nine hours ending at midnight of February 14th.

Schmidt's testimony concerning the towage of loaded barges to the Lambert Wharf, drawing nine feet or so, may be accepted as to the knowledge with which Stevens was chargeable on this subject:

"A. Wind conditions is the thing we practically depend upon.

"Q. That is the determining factor in your mind? A. Yes. If you get a northwest wind, your water does not come into the creek. On the second day you are taking a chance. On the third day you can't go in at all. Lots of times you can't go in there two or three days at a time.

"Q. Do you consider the first day of such a blowing as making it fairly safe to enter the river? A. Yes, that is as safe as it could be.

"Q. If I told you that a southeasterly wind was blowing the day before the wind shifted to the southwest or westerly, would that change your opinion any? A. Yes. Then you get so much more water in there; the tide will be so much greater."

The foregoing was undisputed and hence is accepted as indicating the understanding which is chargeable to Stevens, who was towing a scow drawing only eight feet.

Since the actual performance of the tide contradicted Schmidt's version of the expectable, based upon his own observation and experience, it becomes apparent that Gallagher and Exner are trying to hold the tug, not for what was reasonably to be anticipated, but for a contrary actual happening, thus again paying the conventional tribute to hindsight, which is much favored in diverse branches of advocacy—and elsewhere.

If the tug is to be held, not because the tide acted according to expectations as understood by experienced navigators in these waters, but because it did the reverse, justification for such a result must be found in decisions upon which the interests adverse to the tug rely:

Pelham—Seaboard No. 91, 1933 A.M.C. 1096: Here the navigator of a tug, having two scows in tandem tow, entered Eastchester Creek about six minutes earlier than actual high tide at that place, which was one hour and thirteen minutes earlier than predicted high water; and the rise above mean low water was about 2¼ feet less than normal (7.1 feet) because a high northwest wind (36, 40, 62 miles) had been blowing for about twelve hours. The tug expected, according to the tide calendar, about 1½ hours of rising tide in which to conduct the tow to destination in a westerly direction. The changed conditions caused the tug to buck an ebb tide for about 2 miles at the end of which one of the scows grounded, apparently outside the channel, in waters lower than they would have been under normal tidal conditions.

The court found negligence on the part of the tug in that: (a) Arrival at the point of entrance was too late since one hour of rising tide would be required to safely pass the place of striking.

(b) Proceeding against an ebb tide meant that the tug could not anticipate sufficient depth of water at the critical place.

(c) There was a failure to follow the channel.

Evidently the combination of these elements resulted in the decision, and since at least the last two are lacking here, the case is not controlling. Moreover, what the opinion says was well-known to masters navigating in Eastchester Creek is one thing, and Schmidt's quoted testimony here is quite another.

White v. Upper Hudson Stone Co., supra, does not make clear whether the towing vessel was held because the tide was too low to enable a scow drawing 6½ feet to cross an 8-foot bar, or because the sea was too rough to avoid pounding during the attempted passage. That explains the reference to the necessity for showing "reasonable skill to judge the weather".

That strand occurred in daylight, while this was just after midnight. It is said in the opinion that the scow, while in care of the towing vessel, "pounded and stranded, either because her draft was too great for the bar, or the swell was such that even at highest tide she pounded when in the trough. No matter which story is true, the Ono is liable. If the water was insufficient when calm, her master inexcusably misjudged the tide; if the swell was such as to let the tow pound, he ought to have perceived that such would be the case, for it was daylight and fine weather, and there was no necessity of going over the bar on that particular tide."

The Scipio, 1938 A.M.C. 1207. Here a tug was held for causing a loaded scow in her tow to strand outside the channel lines in the Kill van Kull. It was said that the burden rested upon the tug of showing that the obstruction which caused the stranding (if indeed there was one) was inside the channel lines, and unknown to navigators, and that the burden had not been borne.

In this present case the obstruction lay within the channel lines, and was also unknown to navigators.

For lack of factual similarity, the foregoing cases are not deemed to point the way to decision here.

■ The only criticism of Stevens that survives a consideration of the evidence as a whole is that he entered the Rahway River on February 15th with a tow drawing 8 feet, without seeking advice, or taking into consideration the force and direction of the wind during the then preceding eleven hours. Since it appears, however, from Schmidt's uncontradicted testimony (and that of Van Pelt by consent) that, had he done both of these things, he would have come to the conclusion that the projected trip could be safely made, it is not perceived thus far how it can be concluded that the tug has failed to demonstrate that the stranding at about 12:30 A.M. of February 16th could not have been avoided by the tug in the exercise of proper care and skill.

It is true that Stevens' testimony, as to whether the surface of the water was up to the bottom of the third plank on the bridge parapet when he entered the river, is less than convincing, for at best it comes down to his belief that he must have looked, and must have observed that such was the fact, otherwise he would not have proceeded even with a scow drawing but 8 feet. Had there been any evidence that in fact the tide did not rise so far by 11:30, I should have been inclined to disregard his somewhat anemic testimony on this point, but there is none.

He says he did know as the tow proceeded, that the tide probably would not reach its normal height, but it was then not feasible to turn around and go back. That, however, does not justify the inference that, when he entered the river, he had indeed observed that more than the three top planks of the parapet were in view.

It is also said in the Exner brief that, once the scow came afloat a little after midnight of the 15th and about 600 feet below the place of the second strand, she should have been anchored in the stream to await full floodtide in order to assure her safely passing over the rock that no one knew to be there.

It is not surprising that there is no expert opinion evidence in the record to fortify that contention, if it is indeed pressed; nor does it appear whether the scow carried an anchor.

It does appear, however, that there was no scowman on board, and that a deckhand from the tug was on the scow, at the forward end as she was towed, taking soundings at both sides as the tow proceeded in the dead of night, up the river; and that not less than 9 feet was found until the instant of striking.

It is thought that the argument fails of necessity because of the undisputed fact that the presence of this rock was unknown not only to Stevens but to Schmidt and Van Pelt, the only other navigators called.

Stevens had to deal with the situation as he and the others knew it, not as it has since been revealed. But for this rock, there was sufficient depth of water for him to bring the scow to Lambert's Wharf on this rising tide, for all that the evidence shows to the contrary. He was having soundings taken to assure a safe passage through these shallow waters as he knew and had experienced them, but not in the expectation that a new and hitherto unknown peril might develop.

■ The arguments against the tug, if allowed to prevail, would place her in the category of an insurer, a result which all cited authorities disclaim.

48

It results that, in the limitation proceeding, the Petition for Exoneration must be granted, with costs.

 The libel of the Exner Sand & Gravel Corporation, as owner, against Gallagher as charterer, must be disposed of on the theory that the charterer Gallagher has gone forward with proof of freedom from negligence which would otherwise be presumed from the failure to return in good order and condition, since the only negligence attempted to be shown was that of the Wrestler. Her negligence would be attributed to Gallagher (White v. Upper Hudson Stone Co., supra; The E. T. Halloran, 2 Cir., 111 F.2d 571), and since her freedom from the negligence specified is deemed to have been established, such a finding necessarily operates to exonerate Gallagher from the prima facie showing arising from failure to redeliver, etc. Thus the libelant Exner has failed to sustain the burden necessary to the maintenance of its cause, and the respondent Gallagher is entitled to a decree of dismissal with costs. See: Alpine Forwarding Co. v. Pennsylvania R. Co., 2 Cir., 60 F.2d 734; The Roslyn, 2 Cir., 93 F.2d 278 at page 281.

Settle decree in accordance with foregoing.