EXNER SAND & GRAVEL CORPORA-
TION v. GALLAGHER BROS. SAND &
GRAVEL CORPORATION.

THE HENRY E.

Petition of STEVENS.

THE WRESTLER.

No. 265, Docket 20177.

Circuit Court of Appeals, Second Circuit.
Sept. 10, 1946.

Purdy & Lamb, of New York City, for
Exner Sand & Gravel Corporation.

Krisel & Beck, of New York City, for
Stanley Stevens.

Foley & Martin, of New York City, for
Gallagher Bros. Sand & Gravel Corpora-
tion.

Before SWAN, CLARK, and WOOD-
BURY, Circuit Judges.

WOODBURY, Circuit Judge.

This litigation grows out of the strand-
ing of the scow "Henry E" on a submerged
rock while it was being towed up the Rah-
way River by the tug "Wrestler."

Exner Sand & Gravel Corporation, as
owner, filed a libel in the usual charter
form against Gallagher Brothers Sand &
Gravel Corporation to recover for the dam-
age occasioned to the scow when it struck.
Thereupon, and before Gallagher Brothers
answered, the owner and master of the tug
filed a petition for exoneration from or
limitation of liability on the ground that
the rock upon which the scow impinged
"was neither charted nor known to peti-
tioner, or navigators or others familiar
with the waters of the Rahway River."
Gallagher Brothers subsequently admitted
Exner's prima facie case, that is, the lat-
ter's ownership of the scow, its oral charter
for an agreed per diem hire, its delivery
in good seaworthy condition and its re-
turn in damaged condition (see The E. T.
Halloran, 2 Cir., 111 F.2d 571), and in its
answer to the libel alleged, inter alia, that
any damage which the scow may have sus-
tained was due "to the fault, neglect or
want of care on the part of the tug 'Wres-
tler,' and those in charge of her," for which

it was in no way responsible. Both Exner and Gallagher Brothers filed claims and answers in the limitation proceeding in which, among other matters, they alleged that although the petitioner therein held himself out as an expert navigator of the Rahway River, he nevertheless lacked the requisite knowledge and skill in that he failed to take into consideration the effect of the wind upon the tide and failed to realize when he entered and proceeded up the river that the tide was not high enough for his voyage. The libel and the petition for exoneration were consolidated for trial in the District Court, and that court, finding the stranding of the scow not due to the neglect of the master of the tug which had it in tow (60 F.Supp. 43), entered a final decree granting the petition for exoneration and dismissing Exner's libel on the merits. Thereupon the latter took this appeal to us.

■ The evidentiary facts are not in dispute. The only issue on this appeal is with respect to the conclusion drawn from those facts by the District Court. It is accurately stated in the brief of the petitioner for exoneration as "Whether the finding of the court below that the Tug 'Wrestler' was not negligent in stranding appellant's scow on an unknown and uncharted rock in the fairway is 'clearly erroneous.'" See Petterson Lighterage & Towing Corp. v. New York Central R. Co., 2 Cir., 126 F.2d 992, 995, 996. We think this question must be answered in the negative.

The Rahway River is a shallow, winding stream, in reality little more than a creek, flowing in a generally easterly direction through New Jersey and emptying into Arthur Kill about one-half mile south of Pralls Island. It is spanned in its lower reaches by two railroad bridges; one practically at its mouth and another approximately a mile and a half upstream. Only its lower mile or so is shown upon any chart issued by the United States Coast and Geodetic Survey. It is described in the United States Coast Pilot for the Atlantic Coast, Section B, Cape Cod to Sandy Hook, published by the United States Department of Commerce, Coast and Geodetic Survey, 1940 edition, as having a controlling depth of 6 feet for a width of 50 to 100 feet from its mouth to Lambert's Wharf, a distance of about two miles, and as frequented only by motor boats and other small craft.

Nevertheless the evidence is conclusive, and the court below found, that for many years boats, for the most part loaded scows and barges, drawing as much as ten feet, have been towed up the river as far as Lambert's Wharf, now the Thorn & Wilmerding Dock, in Linden, New Jersey, the destination of the "Henry E" at the time of the disaster. But boats of such draft can go up the river only on a comparatively normal flood tide, and the direction and force of the wind greatly affect the ebb and flow of the tide in the river—a westerly or northwesterly wind of 24 hours or more duration having a tendency to retard the flow of water up the river and therefore to make the peak of the tide therein lower than normal, and an easterly or southeasterly wind of similar duration having a contrary tendency. The court below found that while care is required in navigating the river with boats drawing as much as ten feet, "it is not necessarily hazardous, when it involves vessels of that draft, at or just prior to flood tide. The testimony is convincing that it is customary for towing vessels to wait at the mouth of the stream until about an hour or more before high water, and then to proceed, provided (a) that the surface has risen to the third plank from the top of the parapet supporting the first railroad bridge to be encountered as the tow moves upstream, and (b) that strong westerly winds have not prevailed for more than one previous day to keep the tide from rising to its customary level."

We turn our attention now to events immediately preceding the disaster and to the disaster itself.

The tug "Wrestler," then being operated by her owner, the petitioner in the exoneration proceeding, took the scow "Henry E" in tow, stern first, on a bridle hawser so rigged that about fifteen feet of water separated the sterns of the vessels, at Elizabethport, New Jersey, on February 15,

1944, at about 6:30 A.M. The scow was partly loaded with sand and drew eight feet. The tow proceeded down Arthur Kill to Carteret, New Jersey, where it tied up to a wharf just below the mouth of the Rahway River at about 9:00 A.M. It left Carteret at about 11:00 A.M. and entered the river about one-half hour later on a tide predicted to reach its peak a little after 1:00 P.M. At that time the wind was blowing from the west with a velocity of 33 miles per hour, and it had blown from the southwest, west-southwest, and west since the preceding midnight, with a force rising to 25 miles per hour at 2:40 A.M., and it continued in that range until 10:30 P.M. that night. But beginning at about 3:00 P.M. on the previous day, February 14, and continuing to midnight on that day, the wind had been in the east, northeast, east-northeast, south-southeast, southeast and again east, with a velocity arising from three to 25 miles per hour, with fresh and at times strong gusts. It appears that in consequence of these winds the tide upon which the "Wrestler" entered the river behaved quite erratically. Although it was due to reach its peak at 1:00 P.M. and normal high water in the Rahway River is from four to four and one-half feet above mean low water, it actually reached a peak of only 2.2 feet and did so at 11:00 A.M., then receded slightly, but rose again to 2.1 feet just before 1:00 P.M., when it began to ebb.

The testimony of the master of the "Wrestler" as to whether he observed the behavior of the tide as he entered the river is, as the court below observed, "less than convincing" and "somewhat anemic." He testified that he was familiar with the use made of the parapet of the first railroad bridge by navigators of the Rahway River as a gauge by which to measure the height and behavior of the tide in that stream, and that he did not consider it safe to go up it with a tow, even one drawing only eight feet, unless and until the tide had risen in comparatively normal fashion up to or nearly up to the bottom of the third plank from its top. But the most that he cared to testify to was that he must have looked at the parapet of the bridge and determined that there would be a good enough tide to take a scow drawing eight feet up the river, or else he "wouldn't have undertaken the job."

But whatever the observations, if any, of the master of the "Wrestler" may have been, he nevertheless took his tow up the river, and just above the second railroad bridge, and so above the charted part of the stream, the scow grounded gently in the channel and could be moved no further. In this grounding it sustained no damage and as the tide receded it rested evenly on the bottom. The "Wrestler" stood by and between 11:50 P.M. on February 15, and 12:30 A.M. on the sixteenth, on the next rising tide, which was predicted to reach its peak at about 2:00 A.M. but in fact reached its peak about forty-five minutes later, the scow floated and began to drift upstream. The "Wrestler" was at once made fast to the scow in the same way that it had been before and the tow proceeded on its voyage at about three-fourths miles per hour, the deck hand of the tug, stationed on the scow, taking soundings from time to time and finding depths of nine and ten feet. Approximately seven minutes later, the tow in that time having covered a distance of approximately 600 feet, the scow struck a submerged rock in that portion of the bed of the Rahway River which constitutes the channel as used, but somewhat nearer to the northerly shore than to the center, upon which it rested and from which it could not be moved. This rock damaged the bottom of the scow to such an extent that eventually it sank.

The District Court found that this rock was pyramidal in shape and projected approximately 3½ feet from the bed of the river, that it was uncharted and unknown to navigators of the river, including the master of the "Wrestler," and that at the time of the stranding there was a sufficient depth of water all around it to have permitted the scow, but for the rock, to have proceeded up the river in safety, there being a depth of water except for the rock at the time and place of the stranding of not less than 8.9 feet.

The appellant does not question the firmly established rule that the master

of a tug is not liable for damages resulting from his tow striking an unknown and uncharted rock in the fairway. See The Arlington, 2 Cir., 19 F.2d 285, 286, 54 A.L.R. 101. It rests its contention upon the equally well settled rule that a tug-master who voluntarily deviates from the customary channel does so at his peril and is liable for the consequences of a stranding during such a deviation, even though the rock or shoal upon which his tow strikes is uncharted and unknown. See also The Arlington, supra. It says that there is no difference in principle between voluntarily deviating from a channel and voluntarily proceeding up one when the water in it is so low by reason of an insufficiently high tide that the bottom of the tow is brought into dangerous proximity to the bottom of the waterway, and it says that only the grossest inattention can explain the failure of the master of the "Wrestler" to observe that the tide was not rising in the normal way to anything even approaching its normal height when he entered and proceeded up the river.

We may concede, as the appellee does, although we need not decide, that an unnecessary voyage through a channel at a stage of the tide therein which is known, or should be known, to be dangerously low, that is, a needless voyage amounting to one of exploration of the bottom of a channel, if proved, would bar exoneration if it resulted in disaster. But this is not the situation presented here.

The expert evidence, confirmed by findings of the District Court [60 F.Supp. 46] is that it takes about a day for a westerly wind to affect the height of a tide in the river so that, on the first day of such a wind it "is as safe as it could be" to enter the river on a rising tide, that on the second day of such a wind "you are taking a chance," and on the third day "you can't go in at all," and that an easterly wind during the day preceding the first day of a westerly one counteracts the initial effects of the latter with the result that "you get so much more water in there; the tide will be so much greater."

Thus when the master of the "Wrestler" entered the river at 11:30 A.M. on February 15, he was not chargeable with knowledge that the tide predicted to reach its peak at 1:00 P.M. would behave so abnormally as actually to reach its peak two hours early and then remain practically stationary until the time it was normally due to ebb, since, although a westerly wind was then blowing, it had blown for only twelve hours and had been preceded by a generally easterly one. Under the circumstances disclosed he could very reasonably have expected as he entered the river that he would have about an hour and a half of rising tide on which to take his tow to its destination, that being the time ordinarily allowed for the voyage. And charging him with knowledge when he entered the river that the tide was in fact a foot or so lower than normal tides an hour and a half before their peak does not necessarily charge him with negligence, since tows drawing ten feet of water were frequently taken up the river and his tow drew but eight feet. From this analysis we conclude that the District Court's finding that it was not negligent for the master of the tug to have entered the river when he did not only is not clearly erroneous, but instead is clearly indicated.

The same may be said with respect to the District Court's conclusion that it was not negligent for the tug-master to have proceeded with his voyage after the first grounding.

When the scow began to drift upstream on the rising tide that released it from its first stranding, the master of the tug was confronted with a choice between alternative courses of conduct. Obviously in the exercise of due care he could not let the scow drift. He was clearly called upon to make fast to it, as he did. But having done that, he could anchor in the stream to await daylight and tidal developments, and run the risk of grounding again, if he had possessed a suitable anchor, a matter not disclosed by the evidence, or he could have turned around, an obviously hazardous maneuver in a narrow, shallow channel in the dead of night and with a tide running, and then have towed against the tide back to the mouth of the river, or he could have done what in fact he did, i. e., proceed with the remaining half mile or so of his

voyage. In doing so he said that he anticipated that due to wind conditions the tide would not reach its normal height, but that to continue the voyage seemed at the time the best course to take. The District Court agreed with him and as already indicated we agree with the District Court.

When the scow floated after the first stranding, the tug-master must have known, at least he is chargeable with knowledge, that it was between an hour and a half and two hours before the tide was due to reach its peak, whereas when the scow grounded the tide had been nearly at its peak, and he said that he knew that the westerly winds which had continued while the scow lay aground would tend to make the second tide somewhat lower than the preceding one. But obviously he must also have known from the fact that the scow floated that the tide, although substantially short of flood, was nevertheless higher than it had been when the scow ran aground, and when it ran aground, as we have already shown, the tug-master could reasonably have expected water enough in that part of the river to take him safely to his destination. In the face of these conflicting indications and there being nothing in the vicinity of the stranding comparable to the parapet of the first railroad bridge which navigators of the river used to gauge the height of the tide, he elected to proceed with his voyage. But he did so cautiously. He went at slow speed and he had soundings taken from the scow which indicated an adequate depth of water. Under these circumstances, we think he could reasonably have believed that it was safe for him to complete the short remainder of his voyage. In fact, considering what he then knew or should have known, he could reasonably have believed that to be the safest course for him to take. And since the District Court found that at the time of the second stranding there was water enough for his purposes in the channel all around the rock, no doubt but for the rock that would actually have proved to be a safe course. Indeed from this latter finding it is evident that it was not insufficient water in the channel, any more than insufficient water is the cause of any stranding, but the uncharted and unknown rock jutting up from its bottom which caused the disaster, and from this it follows that the tug-master is not liable.

The decree of the District Court is affirmed with costs in this court against the appellant.