**LEHIGH VALLEY RAILROAD COMPANY, Libelant,**

v.

**THE RUSSELL NO. 1 and Russell Bros. Towing Co., Inc., Claimant-Respondent.**

and

**The City of New York, Respondent-Impleaded.**

No. 20062.

United States District Court
E. D. New York.

July 21, 1958.

Pyne, Brush, Smith & Michelsen, New York City, by Warner Pyne and Albert Robin, New York City, of counsel, for libelant.

Alexander, Ash & Schwartz, New York City, by Edward Ash, New York City, of counsel, for claimant respondent.

Peter Campbell Brown, Corporation Counsel, by James W. Fay, Asst. Corporation Counsel, New York City, for City of New York.

RAYFIEL, District Judge.

The libelant, owner of the Gas Hoist Lehigh Valley 476, hereinafter referred to as the L. V. 476, brought this action to recover for the damage sustained by it and for the loss of or damage to its cargo on July 7, 1952, by reason of the negligence of the claimant-respondent's Tug Russell No. 1, while being towed by her. The claimant-respondent has impleaded the City of New York, the owner of the property adjacent to the scene of the occurrence, claiming that the accident occurred because of the negligence of the respondent-impleaded in failing to maintain the bulkhead, cribbing, etc., on its property in such condition as would prevent obstructions in and of the adjoining navigable waters.

The L. V. 476 is without motive power. It is 106 feet long, has a beam of 33 feet and of depth of 9 feet, 1 inch. Its deck being longer than its bottom, it has a rake at the bow and stern, the lines running from the bow and stern to the bottom forming an angle of about 45 degrees to the deck, as revealed by the photographs marked Libelant's Exhibits 7, A, B, C and D in evidence. At the time of the accident it was laden with about 865,550 pounds of scrap iron, and its draft was about 6 feet 6 inches forward and about 7 feet aft. It was the third and last vessel in a tandem tow which had been made up in the English Kills by the Tug Russell No. 1, consisting of the coal barge Bernie, the Gas Hoist Marikopa and the L. V. 476, in that order.

The Tug Russell No. 1 has 220 horsepower, is 63.3 feet in length, has a breadth of 17.1 feet and a depth of 8.1 feet. The coal barge Bernie is 111 feet long, 34.4 feet in beam, and has sides of 11.9 feet. It was light, and drew about 1½ feet of water. The Gas Hoist Marikopa is 100.1 feet long, 34.3 in beam, was also light, and drew about 1½ feet of water. The stern of the tug was made fast to the bow of the Bernie by double lines to her port and starboard corners; the Bernie's stern, in turn, was made fast to the Marikopa's bow by double lines from her port and starboard corners to the Marikopa's port and starboard corners, and the Marikopa's stern was made fast to the bow of the L. V. 476 in the same manner. There was a clearance or slack in the lines between each pair of vessels of about 1½ feet.

At the time of the accident the tug had a crew of three aboard, consisting of the Captain, the Chief Engineer and a deck hand. The Bernie had a bargee aboard. The Marikopa and the L. V. 476 were unattended.

At about 3:50 P. M., eastern daylight saving time, on July 7, 1952, the Tug Russell No. 1, with the three vessels in tow, left the Central Coal Dock in the English Kills, bound for Dupont Street at the mouth of Newtown Creek, and proceeded east to the point at which the English Kills empties into Newtown Creek. The tug had turned left into Newtown Creek, when Albert H. Cooke, the bargee aboard the Bernie, who was watching the lines on the vessels, observed that the port line between the Marikopa and the L. V. 476 had parted. He immediately informed the Captain of the Tug, Arthur E. Diehl, of that fact. The latter sent his deck hand to assist Cooke. After an inspection the deck hand returned and informed Captain Diehl that the L. V. 476 was taking water. The Captain stopped the tug, let go the hawsers between the tug and tow, went back to the L. V. 476, and observed that it was listing to port. He tied the Bernie, with the Marikopa astern, to one of the piles at the abandoned dock on the northwest corner of the English Kills and Newtown Creek, and then he pushed the L. V. 476 to a cove on the eastern shore of Newtown Creek in an effort to beach it. However, it capsized and sank before reaching the shore. After it was raised it was found that there were two broken end planks at the bow near the lower port corner. The

breaks appear very clearly on the aforesaid Libelant's Exhibits 7, A, B, C, D.

At the time of the occurrence the tide was at ebb, and the wind was from the south at approximately 12 miles an hour. The dredged channel of the English Kills is approximately 120 feet in width. Just before it enters Newtown Creek it widens to approximately 165 feet, and at the entrance to the Creek it is about 250 feet wide. The channel depth in the English Kills and in Newtown Creek is 16 feet at mean low water.

The libelant introduced evidence to show that there were broken and scattered piles in the area adjacent to the city's property (the abandoned Bossert Dock) located at the northwest corner of the entrance to Newtown Creek from the English Kills, the tops of which were submerged even at mean low water. Those piles were located in the water, some five to ten feet off the city's property (the said dock). It contends that the tug captain took the tow out of the dredged channel and into the area near the city's property, thereby causing the L. V. 476 to strike one of those piles and sustaining the damage which is the basis of this action.

The respondent-claimant, through Captain Diehl and Cooke, had adduced testimony to the effect that immediately prior to the accident the tow was between 30 and 40 feet south of the point where the north bank or shore of the English Kills meets Newtown Creek and that therefore the L. V. 476 could not have struck one of the piles near the city's property. It contends that the L. V. 476 must have struck some submerged object in the channel which its Captain could not see, and, hence, that it is not liable to the libelant.

The law, it is true, is well settled that a tower is not liable for damage to its tow caused by a submerged object in the channel which is not charted. See Exner Sand & Gravel Corp. v. Gallagher Bro. Sand and Gravel Corp., 2 Cir., 157 F.2d 291; The Arlington, 2 Cir., 19 F.2d 285. But it is also well settled that a tug has a duty to follow the usual channel or course and its owner is liable for any injury which results from an unnecessary deviation from the customary channel. 86 C.J.S. Towage § 60(b), p. 1025.

The question to be decided here is: Did the Russell No. 1 take its tow in the customary channel, in this case the dredged channel, in the English Kills and Newtown Creek, or did it deviate from the channel and take the tow too far over to its port side, thereby causing the L. V. 476 to strike one of the submerged piles near the city's property?

After analysis I am satisfied that the testimony of Captain Diehl, the Captain of the Russell No. 1, and Cooke, the bargee of the Bernie, is unworthy of belief. Diehl's recollection and judgment of time and distance was extremely faulty. One instance thereof was his insistence, when asked the beam of the Tug Russell No. 1, of which he had been Captain some two years, that it was 6½ feet—incredible beam for a tug—whereas counsel stipulated that its beam was 17.1 feet. His answers to questions were vague, indefinite and equivocal. His testimony was at variance with his statement respecting the accident, made the day after it occurred, when he said: "I think that the port bow of the Lehigh Valley 476 must have struck a submerged object of something *at the Old Bossert Dock* at Maspeth Avenue and when this happened, the line from the port bow of the Lehigh Valley 476 to the port stern of the Maricopa (Sic) parted." (Emphasis supplied.) (Libelant's Exhibit 11.) The only reference in that statement to the location of the tow is the excerpt therefrom, hereinabove quoted, to the effect that the L. V. 476 struck a submerged object *at* the Bossert Dock. That statement, coupled with Cooke's statement (Libelant's Exhibit No. 10), made on May 23, 1953, less than a year after the accident, leads me to conclude that the tow was out of the channel and close to the city's property, known as the Old Bossert Dock. Cooke, in his said statement, stated "The tow had stopped. *The 'L. V. 476' was on top of some piles that were broken off alongside of a broken*

*dock on the left side of the bank.* (The water was high at the time and *I could see some of the broken piles underneath the water.*" (Emphasis added.)

His explanation of the discrepancy between that statement and his testimony at the trial was incredible. When asked by the Court if his recollection of the accident was at least as good at the time he gave the statement as it was at the trial almost five years later, he said (S.M.P. 231 and 232): "The truth is, sir, it is a little better now because I went over it and I thought about it as, you know, I have been in court here yesterday. I have been concentrating on it, trying to remember exactly what happened. There are some things that I don't remember yet, exactly what happened. But I do remember a few points at the time. I didn't remember at that time." Later, as appears from the following series of questions and answers, he admitted that the statement was true (S.M.P. 232):

> "The Court: You say your recollection is better now than it was at the time that the statement was made? Don't you mean that your recollection is refreshed now that you have read this statement?
>
> "The Witness: Yes.
>
> "The Court: Is that what you mean?
>
> "The Witness: Yes, Sir.
>
> "The Court: Then was that statement correct when it was made?
>
> "The Witness: Yes, sir, it was.
>
> "Q. Is it correct, today, Captain? A. (No Answer.)
>
> "Q. Was the 476 on broken piles as you say in this statement, or wasn't it? That is what I want to know. A. When I made the statement, sir, at the time, I, as far as I could be sure, it was on top of pilings, yes, sir.
>
> "The Court: I don't think we need belabor it any more."

As appears from the foregoing, Cooke's testimony was evasive, uncertain and unconvincing. I do not believe that the tow was 35 to 40 feet from the city property at the time of the accident. I believe, instead, that, as appears from the said statement, "the tug made a *sharp* port turn around the bend" following which "the 'L. V. 476' was on top of some piles that were broken off alongside of a broken dock on the left side of the bend". (Emphasis added.)

■ I find, therefore, that Captain Diehl was negligent in his operation of the tow, thereby causing damage to the Lehigh Valley 476 and loss of its cargo, for which the libelant is entitled to a decree against the claimant-respondent.

I come now to the claimant-respondent's claim over against the City of New York, the respondent-impleaded. An examination of the photographs marked Russell's Exhibits C, D, E and F show most graphically the state of disrepair of the city's dock and bulkhead at the time of the accident. Witnesses testified, and said exhibits confirmed, that the dock had been abandoned for a long period of time and had been permitted to deteriorate. One Ahlstrom, a diver, testifying concerning the submerged piles alongside the city property, stated:

> "We went along, as it states in the report. We found roughly twelve of them, approximately from three to four feet below the water.
>
> "They were in rough shape, the lot of them.
>
> "They were extending outward into the channel, and northerly or various different directions." (S.M.P. 48.)

His findings were corroborated by the chart prepared by the U. S. Army Corps of Engineers on July 22, 1952, marked Libelant's Exhibit 5.

■■ In my opinion the City of New York was negligent in the maintenance of its property in question. The submerged piles constituted a hazard to navigation, particularly so since the junction of the English Kills and Newtown Creek is a busy waterway, as was testified to by witnesses. If the City

of New York had kept its property in proper repair there would have been no submerged piles (See Berwind White Coal Mining Co. v. City of New York, 2 Cir., 48 F.2d 105), and the Russell No. 1 and her tow would have been able to make its port turn without incident for the aforementioned chart (Libelant's Exhibit 5) shows that there was ample depth at mean low water even close to the dock for the Russell No. 1 and its tow to have negotiated that port turn without hazard.

Accordingly, it is my conclusion that the City of New York is liable to the claimant-respondent for such damages as the latter will be required to pay to the libelant.

Submit proposed findings of fact, conclusions of law and decree in conformity herewith within twenty days from the date of the filing hereof.