THE RALEIGH.

THE CYNTHIA II.

No. 2598.

District Court, D. Maryland.

July 20, 1943.

962

George W. P. Whip, of Baltimore, Md., for libellant.

John H. Skeen, of Baltimore, Md., and John W. Oast, Jr., of Norfolk, Va., for respondents.

COLEMAN, District Judge.

This is a libel suit brought for the loss and damage of part of a cargo of superphosphate shipped by the Baugh Chemical Company, at Baltimore, on its barge, the Raleigh, consigned to an affiliated company, Baugh & Sons Company, at Norfolk, Virginia. The latter company has paid the Baugh Chemical Company for the superphosphate, and while the libel was originally filed by the Baugh Chemical Company as owner of the barge Raleigh and bailee of the cargo, Baugh & Sons Company was subsequently allowed to intervene as owner of the damaged cargo, in order that any recovery made by the Baugh Chemical Company might be for the account of Baugh & Sons Company.

The cargo was damaged as the result of a collision between the Raleigh and another barge, the Howard, which was in tow of the tug Cynthia II, owned by the Wood Towing Corporation, respondent, which had been engaged by the Baugh Chemical Company to tow the barge Raleigh from Baltimore to Norfolk.

The Cynthia II towed the Raleigh, a wooden barge 205 feet in length, with a beam of 32 feet and depth 12 feet, to Sparrows Point, Baltimore Harbor, and placed her at anchor there while the tug was getting several other barges in order for the tow. The collision occurred while the Raleigh was thus at anchor. The Cynthia II was bringing up the barge Howard made fast to her, that is, the tug's starboard side. Due to admittedly improper navigation, the tug went ahead instead of astern, causing the Howard to strike the Raleigh on the latter's port side. The tug proceeded to get her tow in order and started for Norfolk. The Raleigh was found to be leaking before and during the voyage, and when the cargo was discharged at Norfolk, it was found that more than 400 tons, out of a total of approximately 1,473 tons, of the superphosphate had sustained water damage.

The present libel is in rem as well as in personam, but the Cynthia II was not located, and another tug, the John A. Hughes, also owned by the respondent, the Wood Towing Corporation, was attached by foreign attachment, and the present libel has proceeded against that Company.

■ No time need be spent on the question of the tug's responsibility for the collision, because really not disputed. It makes no difference whether we speak of that liability in terms of faulty navigation or of faulty equipment in that the tug's engine room bell ropes were not working properly —as to which there is supporting evidence— because it is reasonable to draw only one conclusion from the testimony, namely, that the collision was due directly to the fault of the tug, in either one or both of these respects. The tug was not liable to the tow as an insurer or as a common carrier, but it was the tug's duty to exercise such reasonable care and maritime skill as prudent navigators would employ under the circumstances. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; Southgate v. Eastern Transportation Co., 4 Cir.,

21 F.2d 47. The relation of a tug to the tow's cargo may be that of a common carrier, but if, as here, it is a case of private carriage, the general rules of bailment govern, and the Harter Act, 46 U.S.C.A. § 190 et seq., or the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., do not of themselves operate to relieve the tug of liability to the tow's cargo for the result of negligence in the tug's navigation. In order to have such statutory protection, it was necessary in the present case to have a contract to that effect. Koppers Connecticut Coke Co. v. James McWilliams Blue Line, 2 Cir., 89 F.2d 865, certiorari denied 302 U.S. 706, 58 S.Ct. 25, 82 L.Ed. 545. Compare Sacramento Navigation Co. v. Salz, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663. There is no such contract.

We turn, then, promptly to the question as to the extent of the recovery that should be permitted. Taking up first the question of the damage to the barge Raleigh herself, while the repair bills are unquestionably large, aggregating nearly $10,000, we reach the conclusion, on the weight of the credible evidence, that they should be allowed. There are two bills, one covering repairs in May and the other in June, 1942, after the barge was floated. There is no dispute as to the liability for the first repairs, but the respondent contends that the second bill, in the amount of $4,515, is really to cover work for repairs which can not reasonably be said to have been rendered necessary by any unseaworthy condition of the barge which was a proximate result of the collision.

■ With this we are not able to agree. Most of the evidence that the Court is asked to rely upon in support of the towing company's position is deposition testimony. As opposed to that, the Court has had the benefit of seeing and hearing the two surveyors who examined the barge and reported on her condition, one employed by the libellants and the other by the underwriters for the tug. Where the Court has had an opportunity to see, hear and appraise witnesses themselves, it may very properly rely more upon their testimony than upon deposition testimony. The statements of both surveyors, whom the Court heard, is believed to support the reasonableness of both repair bills. In short, the fair inference from the testimony, taken as a whole, is that a very severe blow was received by the Raleigh when the barge Howard struck her,

and by reason of the weight of her cargo and her wooden construction, much of her planking and caulking was disturbed. It probably was impossible to determine, with anything like complete accuracy, the full extent of the damage thus caused. However, the weight of the credible evidence satisfies the Court that the extensive additional caulking, etc., which was done in June, after the Raleigh was floated and found to be leaking, was clearly indicated as necessary in order to make her tight. She had not leaked in this manner before the collision; she had carried two previous cargoes of superphosphate without water damage, and, therefore, it is reasonable to assume that the collision caused her leaky condition. This is borne out by the testimony of Superintendent Barnes who had charge of the work.

■ It may well be that as a result of these extensive repairs the Raleigh was a better vessel than before they were made. However, it is well established that even if necessary repairs do make a vessel stronger and better than she was before a collision, that fact cannot be taken advantage of by those responsible for the damage. Shepard S. S. Co. v. United States, 2 Cir., 111 F.2d 110.

■ As respects the fee charged by libellants' surveyor Delgarno, while survey fees and charges for supervision of repairs may properly be included in collision damages—see The Ashwaubemie, 4 Cir., 3 F.2d 782—this charge of $450 is believed to be excessive. It is true, no specific testimony was presented as to the normal or average charge for similar services, but we do not feel that this surveyor has proved that it is reasonable to charge as much as $450 for the relatively small amount of time and labor that he, personally, gave to the job. Accordingly, the Court will fix the allowance to him at $250.

■ As to the amount of the cargo loss, the weight of the credible evidence justifies recovery of the full amount claimed, namely, $3,186.24. It is true there is a paucity of evidence as to just what was the market value of this superphosphate at the time it was damaged. Also, there may be some degree of uncertainty as to whether there has been proof of the precise extent of the damage. However, the testimony of libellants' representatives is not impeached by any other testimony. The market value of the product, undamaged, has been placed

at the price which the consignee libellant, Baugh & Sons Company, paid its affiliate, the consignor libellant, the Baugh Chemical Company, for it, namely, $14 a ton. Libellants' claim is substantiated that out of a total of approximately 1,473 tons, 434 tons were damaged to an extent that reduced the market value of this much of the cargo about 60%, that is, to not more than $8 per ton; and that 22 tons were so water soaked as to be a total loss. The Court has no reason to believe that the witnesses so testifying were not in every respect endeavoring to tell the truth, and to give their honest opinion, based on their own knowledge of the trade, as to what was the true market value of the damaged and undamaged goods.

Finally, as to the point urged upon the Court that, in any event, liability for cargo damage should be divided, because there was an obligation on the part of the barge Raleigh, as well as on the part of the tug, not to have proceeded with the voyage after the collision, and that, therefore, any liability was at least joint, and any loss resulting therefrom should be visited upon both the barge and the tug, we cannot subscribe to this theory. From the moment the tug took the Raleigh in tow in Baltimore harbor preparatory to the trip to Norfolk, the Raleigh's movements were under the full command and control of the master of the tug, because a tug is in entire charge of the make-up of the tow. The Margaret Irving, 2 Cir., 47 F.2d 230. The question therefore arises whether the master of the tug was, in fact, guilty of actionable negligence in electing to proceed with the Raleigh to Norfolk without further investigation as to the extent of the damage caused her, and the probability of the voyage further opening her seams, etc.; in other words, whether ordinary prudence did not require such further investigation and a decision to abandon the trip, to leave the Raleigh at anchor, and to report the collision and her condition to his superiors.

In justification of the master's decision to proceed to Norfolk with the Raleigh in his tow, it should be noted that there was little outward evidence of serious damage to the Raleigh. None of her planking was visibly broken, and it is not uncommon for barges of this type, especially when heavily loaded, to leak to a considerable extent. Furthermore, the conclusion of the master of the tug to continue down the Bay with the Raleigh in his tow received at least the tacit approval of the Raleigh's master. However, as already indicated, it was not the latter's duty to make the decision, but the duty of the master of the tug. It may reasonably be assumed that the seams, etc., of the Raleigh were further opened or thrown out of alignment by reason of the voyage. Likewise, we may assume that the damage to the cargo was increased by the voyage, because of increased leaking of the barge which the voyage may have caused. The weight of the credible evidence seems to indicate that prudence should have dictated to the master of the tug not to proceed with the Raleigh— at least not without notifying her owner and making a more thorough effort to ascertain the extent of her damage. But we need not actually so decide in order to impose full liability upon the tug, since it is clear that the Tug's master alone was responsible for any damage which was the proximate result of the collision; and since it is not possible to segregate, or to identify such additional damage as may have been caused by the voyage, this latter is to be treated as a natural consequence of the tug master's initial fault, for which he must stand responsible. There is no claim of fault on the part of the Raleigh's master or crew during the voyage, or of any intervening unpredictable conditions that aggravated the situation. The Raleigh's two power pumps were kept constantly working during the voyage. Indeed, by the time the tow had reached the mouth of the Patuxent, the Raleigh was leaking so badly that the mate was borrowed from the tug, to help in the emergency.

Such cases as Westchester Fire Insurance Co. v. Pennsylvania R. Co., 2 Cir., 96 F.2d 133, are not in point. There, both the initial fault of the tug with respect to the collision, and the subsequent fault of the barge owner in not using adequate pumping facilities, directly contributed to the damage, and so the Court held that the barge owner's negligence was to be regarded as the sole proximate cause of the barge sinking, since the barge owner, with full knowledge of the tug's fault, failed to take reasonable precautions to avoid the consequences.

A decree will be signed in accordance with this opinion without allowance, however, for interest on the amounts awarded to libellants.