**ALLIED CHEMICAL CORPORATION,**
Libellant,

v.

**GULF ATLANTIC TOWING CORPORA-TION, the BARGE JUMBO, the TUGS GATCO NEW YORK, DOTTIE DEE, LOUISIANA II and GATCO LOUISI-ANA, their engines, apparel and equip-ment, Respondents.**

**No. 8313.**

United States District Court
E. D. Virginia,
Norfolk Division.

Oct. 6, 1964.

Seawell, McCoy, Winston & Dalton, Norfolk, Va., Pyne, Smith & Wilson and Walter L. Hopkins, New York City, for libellant.

Vandeventer, Black, Meredith & Martin, Norfolk, Va., for respondent Gulf Atlantic Towing Corp.

BUTZNER, District Judge.

In this libel Allied Chemical Corporation seeks to recover damages to three separate shipments of its bulk chemicals which were transported by Gulf Atlantic Towing Corporation in its barge JUMBO in January 1961, July 1961 and October 1961. All three shipments were damaged by the entry of sea water in the cargo compartment of the JUMBO.

The incidents of January 1961 and October 1961 are closely related because both of these shipments were carried pursuant to a written agreement dated October 1, 1957. Both times GATCO was carrying in its barge JUMBO Allied's fertilizer from Hopewell, Virginia through the Intracoastal Waterways to southern destinations. In both instances the fertilizer was loaded in good order and condition.

Pertinent provisions of the agreement governing the shipment of the fertilizer are:

"10.  *EQUIPMENT:*

"(a) GATCO shall provide units consisting of a tugboat and a covered hopper barge or barges. Each such barge shall have a capacity of approximately 1500 tons, and ALLIED, except on advice by GATCO of draft restrictions, shall load such barge or barges to capacity. All barges shall have roller type steel hatch covers and single cargo compartments, and shall be weather tight in order to fully protect the dry bulk fertilizers to be transported therein.

"(b) Without limiting GATCO'S obligation to furnish the services and transport the dry bulk fertilizers to the destinations specified, as hereinabove provided, GATCO shall at all times (i) exercise due diligence to make and keep the tugboat and barges seaworthy, properly manned, equipped and supplied for and during the voyage, (ii) tender barges in suitable condition for loading the intended cargo, but ALLIED, for its own account, may prior to loading, and without prejudice to any of its rights hereunder, inspect any such barge or the holds thereof and may refuse to load should any such barge or holds be found unfit for the carriage of said cargo. GATCO shall arrange for a suitable substitute barge or substitute barges within twenty-four (24) hours after AL-

LIED gives notice of rejection to the master of the towing vessel.

"(c) The master of the towing vessel shall make every reasonable effort to supervise both the opening and closing of the roller type hatches at both the ports of origin and destination, and in the event of inclement weather while the barges hereinabove described are in port, the master of the towing vessel shall inspect the hatches of such barges to insure that they are securely closed.

"11. *CONTINGENCIES:* Failure of either party to perform hereunder, if occasioned by Act of God or the public enemy, fire, explosion, perils of the sea, flood, drought, war, riot, sabotage, accident, breakdown of machinery, pumps or facilities, collision, stranding, embargo, government priority, requisition or allocation or other action of any governmental authority, or any circumstance of like or different character beyond the reasonable control of the party so failing, or by interruption of or delay in transportation, inadequacy, deficiency, shortage, lack or failure of labor, stores, materials, product, equipment or cargoes, labor trouble, plant breakdown, or by compliance with order or request of the United States Government or any officer, department, agency or committee thereof or by compliance with the request of any manufacturer for material for purposes of producing articles for national defense, shall not subject said party to any liability to the other, provided, however, that with respect to any voyage undertaken hereunder nothing contained in this Paragraph II shall relieve GATCO from its obligations hereunder following the offering of a barge or barges by GATCO for loading if GATCO'S failure to perform is contributed to by GATCO'S neglect, omission, misconduct, failure to furnish hereunder seaworthy equipment adequately manned with properly trained and, if required, properly li-

censed, personnel, or failure to exert its best efforts to diligently proceed to overcome by sound seamanship and/or any other means available to it any contingency affecting its performance hereunder.

"12. *INSURANCE AND INDEMNITY:*

"(a) ALLIED shall carry insurance on cargo for its own account, and ALLIED hereby waives any and all claims it may hereafter have against GATCO for damages resulting from torts arising in connection with this agreement. Excepted from the foregoing are (i) claims arising out of, resulting from or due to GATCO'S failure to perform as provided in Paragraph 10 hereof and (ii) claims in general average as hereinafter provided in Paragraph 13. ALLIED agrees that certificates evidencing that ALLIED has such insurance and that ALLIED'S underwriters have granted ALLIED permission to waive such rights against GATCO will be furnished GATCO by ALLIED.

\* \* \* \* \* \*

"(4) GATCO hereby waives any and all claims for damages resulting from torts arising in connection with this agreement it may hereafter have against ALLIED except (i) claims arising under Paragraph 9 hereinabove and (ii) claims in general average as hereinafter provided in Paragraph 13, and GATCO agrees that within thirty (30) days of the execution of this agreement GATCO will furnish ALLIED with written evidence that GATCO'S underwriters have granted permission to waive such rights against ALLIED. \* \* \*."

This agreement was prepared by Allied after long negotiations with GATCO. Allied proposed that the contract require the barges to be water tight. GATCO objected and stated that its barge JUMBO was weather tight and not water tight. Photographs of the barge were furnished Allied and an employee of Al-

lied inspected the barge. The contract provided in Paragraph 10(a):

" * * *. All barges shall have roller type steel hatch covers and single cargo compartments, and shall be weather tight in order to fully protect the dry bulk fertilizers to be transported therein."

On April 9, 1959, after the contract was executed and the barge JUMBO had been put in use, Allied wrote GATCO complaining about moisture seeping to the cargo. Allied said that no problem had occurred with two other GATCO barges, SAMBO and BIMBO. Allied requested that the JUMBO be fitted in the manner comparable to the SAMBO and BIMBO.

On April 10, 1959 GATCO replied that SAMBO and BIMBO were sea-going barges with water tight hatches. GATCO stated that it would be impractical to seal the hatch covers on JUMBO in a manner similar to the SAMBO and BIMBO. GATCO also pointed out that Allied had been advised that JUMBO was equipped with weather tight hatches. GATCO concluded its letter by stating that if upon inspection Allied found JUMBO does not meet the terms of the affreightment agreement " * * * the only alternative would be to withdraw it from your service". Allied did not ask that the barge be withdrawn.

JUMBO is a covered, steel cargo barge with a molded length of 195 feet, a molded beam of 35 feet and a molded depth of 12 feet. She has a single hopper or cargo compartment 27 feet wide and 146 feet long. She has a double bottom. The cargo hold is covered with four domed or curved steel hatch covers. The hatch covers roll on wheels in two tracks arranged in such a fashion that the forward and aft covers telescope under the center covers. The hatch coaming rises 18½ inches above the deck. There are 1½ inch open spaces between the tracks and the lower edge of the covers on each side of the barge.

The hatch covers of the JUMBO were not water tight. They would not keep out sea water if a wave broke over the hatches because the water could enter through the 1½ inch opening between the covers and the tracks.

The hatches were weather tight. They were constructed in such a way that they would keep out the rain or water coming down on the hatch. The JUMBO was seaworthy for use on bays, rivers and sounds. It was seaworthy for use on the Intracoastal Waterways System of the United States.

The Court finds that JUMBO satisfied all of the terms of the agreement of October 1, 1957. The provision that the barge should fully protect the dry bulk fertilizers must be read with the specification that it would be weather tight for this purpose. No sound reason exists for this Court to construe the contract to require a water tight barge when the parties specifically rejected the term water tight and agreed upon a weather tight barge only.

In January 1961 a cargo of 1350 tons of ANL fertilizer was loaded aboard the JUMBO at Hopewell, Virginia, and taken in tow by GATCO'S tug LOUISIANA for Charleston, South Carolina. At the time the JUMBO loaded it was seaworthy. The JUMBO was grounded in Lockwood's Folly Inlet, North Carolina by the negligence of GATCO'S tug master. The barge sustained a fracture of the bilge knuckle in the way of #1 transverse frame at the starboard bow and sea water apparently entered the hull at this point. Seventy-five tons of fertilizer were damaged by sea water. The fracture of the bilge knuckle was caused by the grounding.

In October 1961 JUMBO loaded a cargo of 1355 tons of ANL fertilizer at Hopewell, Virginia for carriage to Savannah, Georgia, in tow of the tug GATCO NEW YORK. The master of the tug, despite adverse weather reports, negligently entered Albemarle Sound, a part of the Intracoastal Waterways, where a storm was encountered. Sea water entered the cargo hold through the 1½ inch opening at the under-side of the roller-type hatch covers.

The damage suffered in January 1961 and October 1961 did not result from an unseaworthy barge. In both instances the JUMBO was seaworthy. Both times faulty navigation caused the damage.

Paragraph 12(a) of the agreement of October 1, 1957 absolves GATCO from liability for negligent navigation. This paragraph provides, in part:

"Allied shall carry insurance on cargo for its own account, and Allied hereby waives any and all claims it may hereafter have against GATCO for damages resulting from torts arising in connection with this agreement. Excepted from the foregoing are (i) claims arising out of, resulting from or due to GATCO'S failure to perform as provided in paragraph 10 hereof and (ii) claims in general average as hereinafter provided in Paragraph 13."

The waiver of claims for damages resulting from torts was mutual, for in paragraph 12(b) (4) GATCO waived "any and all claims for damages resulting from torts arising in connection with this agreement it may hereafter have against Allied except * * * claims arising out of loading or discharging and claims in general average.

The waiver of claims for tort determined, in part, the shipping rates.

Allied contends that provisions of the contract absolving GATCO from liability resulting from its own torts are contrary to public policy and invalid.

Dixilyn Drilling Corporation v. Crescent Company, 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963) and Bisso v. Inland Waterways Corporation, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955) invalidate the contractual exemption of a tugboat owner from liability to the barge for the tug's negligence. In each of these cases the tug was towing the shipper's barge. Allied and GATCO, however, do not occupy the same position as the parties in Bisso and Dixilyn. Here GATCO was towing its own barge. The agreement of October 1, 1957 was not a contract of towage and it can not be divided in such a manner as to make it a contract of towage. It was a contract of affreightment—the transportation of goods. See Sacramento Nav. Co. v. Salz, 273 U.S. 326, 328, 47 S.Ct. 368, 71 L.Ed. 663 (1927).

No case has been cited invalidating an exculpatory clause in a private affreightment contract. On the contrary, the Third Circuit has declined to extend to contracts of affreightment the rule invalidating a tower's escape clause. In Texas Company v. Lea River Lines, 206 F.2d 55, 57 (3rd Cir. 1953), the Court said:

"* * *. Libellant here states as the rule of the Wash Gray case that a tower cannot, by contract that towage is to be at the risk of the tow, relieve itself from liability for damage to the tow caused by its negligence in towing. But assuming this is a correct statement of legal principle, it does not cover this case. It applies to the determination of rights and duties between tug and tow where these units of a flotilla represent separate interests. It has nothing to do with the responsibility of a private carrier to a shipper where the carrier alone controls the entire means of transportation, whether a single vessel or tug and tow."

In Bisso v. Inland Waterways Corporation, 349 U.S. 85, 91, 75 S.Ct. 629, 632 (1955), Mr. Justice Black explained the purpose of the rule which invalidates contracts releasing towers from all liability for their negligence:

"* * *. The two main reasons for the creation and application of the rule have been (1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains. These two reasons are no less applicable today than when The Syracuse [12 Wall. 167, 20 L.Ed. 382] and The Wash Gray [277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787] were

decided. And both reasons apply with equal force whether tugs operate as common carriers or contract carriers. The dangers of modern machines make it all the more necessary that negligence be discouraged. And increased maritime traffic of today makes it not less but more important that vessels in American ports be able to obtain towage free of monopolistic compulsions."

Contracts which experienced businessmen have made should not be lightly avoided on grounds of public policy. The policy that makes a tug liable for someone else's barge in order to discourage the tug's negligence is not compelling when the tug's own barge will be the victim of its negligence. The evidence in this case does not disclose that GATCO enjoyed any monopolistic advantage. Public policy, therefore, would not be served by extending to this affreightment contract the rule applicable to a tugboat's towage contract.

██ The Court concludes that the damage sustained by Allied in January and October 1961 was not caused by GATCO'S breach of its agreement to furnish seaworthy equipment. The damage was caused by GATCO'S negligence. Allied effectively waived any claim against GATCO for this negligence. The waiver was not contrary to public policy.

Another ground exists for exonerating GATCO from liability.

Paragraph 12(a) of the agreement required Allied to carry insurance on the cargo for its own account. Allied was obligated to furnish GATCO evidence of such insurance and that Allied's underwriters had granted Allied permission to waive subrogation rights against GATCO.

Originally, Allied furnished a certificate from the Aetna Insurance Company that complied with the requirements of paragraph 12(a). Aetna's policy expired in 1959. On December 31, 1959 GATCO teletyped Allied: "We also require and demand from you certificates as called for under Item 12(a) of the affreightment agreement of October 1, 1957 or revalidation of previous certificate."

Pursuant to this request, the Home Insurance Company, Allied's new underwriter, furnished a certificate which GATCO rejected as inadequate. On January 26, 1960 Home wrote:

"As of October 1, 1959 the Home Insurance Company issued the captioned policy in the name of Allied Chemical Corporation and any affiliated and subsidiary Companies, at a continuous term with no expiration date so that it will remain in force until cancelled by request of either the Assured or the Company.

"This policy insured all cargoes transported on U. S. inland and coastwise waters, but excludes intercoastal shipments, and is subject to a limit of $1,000,000. per vessel, not exceeding, however, $2,500,000. from any one disaster.

"Policy covers, subject to $5,000. deductible, all risks of physical loss or damage from any external cause irrespective of percentage but excluding, nevertheless, the risks of war, seizure, detention and other risks excluded by the free of capture and seizure warranty.

"This policy provides that the Assured may enter into agreements with vessel owners or towing companies waiving right of subrogation against any carrying vessel or any towing vessel or its owners.

"This policy is extended to cover the interest of Gulf Atlantic Towing Corporation as respects cargoes carried on vessels assigned under the affreightment agreement between Allied Chemical Corporation and Gulf Atlantic Towing Corporation."

Home's letter of January 26, 1960 was transmitted to Allied by its insurance brokers, who referred to it as a corrected letter to be delivered to GATCO. The insurance brokers specifically pointed out that the last paragraph was amended to cover vessels assigned under the af-

freightment agreement between Allied and GATCO.

Allied, in turn, on February 8, 1960 forwarded the letter of January 26 to GATCO, stating: " * * *. You will note the last paragraph now specifically provides for Gulf Atlantic Towing Corp. interests as respect to cargoes carried under the Affreightment agreement. We believe there can be no doubt for misconstruing this statement."

Prior to October 1961, for some reason which was never explained, there was no reference to GATCO in the policy of Home Insurance Company. There was nothing in the policy consistent with the letter of January 26, 1960 granting the waiver of subrogation and describing the extension of the policy.

In 1962 the policy was amended to give Allied the right to execute waivers of subrogation of towing companies.

The Home Insurance Company's supervisor of the Multiple Line Department signed the letter of January 26, 1960. He testified that the letter is a part of the policy.

GATCO paid no premiums to Home Insurance Company. It had, in effect, policies of protection and indemnity insurance covering its potential liabilities for damage to cargoes carried by JUMBO for Allied.

Allied takes the position that the final paragraph of the letter of January 26, 1960 from the Home Insurance Company, extending the policy to cover the interest of GATCO was a "gratuitous surplusage" and void for lack of consideration.

The parties have put their own interpretation upon paragraph 12(a). Home, by its letter of January 26, 1960, definitely stated its undertaking. Allied, on February 8, 1960, pointed out that the last paragraph of Home's letter specifically provided for GATCO'S interest with respect to cargoes and concluded: "We believe there can be no doubt for misconstruing this statement." GATCO accepted the implementation of paragraph 12(a). All parties were in agreement that the requirements of paragraph 12(a) had been satisfied. The methods used by Allied and its underwriters to discharge Allied's obligations under paragraph 12(a) were within the discretion of Allied and its underwriters, subject to GATCO'S acceptance. The interpretation given to paragraph 12(a) by the parties and the means used to implement their interpretation should not be disturbed by this Court.

The Court concludes that GATCO was given the benefit of Allied's insurance and that GATCO is relieved of liability for the insured loss. Allied, suing on behalf of Home, is not entitled by any principle of subrogation to recover from GATCO the amounts paid in settlement of the cargo damage which occurred in January and October 1961. cf. Phoenix Ins. Co. v. Erie Transportation Co., 117 U.S. 312, 6 S.Ct. 750, 29 L.Ed. 873 (1886). The facts in Merchants' and M. T. Co. v. Robinson-Baxter Etc. Co., 191 F. 769 (1st Cir. 1911), differ from those before this Court and for that reason the case does not support Allied. Indeed, the case recognizes the general proposition that where a bill of lading provides that the carrier shall have the benefit of the insurance, the right of the insurer to subrogation against the carrier is excluded.

Paragraph 11 does not provide a basis for holding GATCO liable. An analysis of this paragraph shows that in the first clause the parties are excused from liability arising out of certain contingencies. The paragraph next contains a proviso that "nothing contained in *this paragraph 11*" shall relieve GATCO from the consequences of neglect, etc., or the failure to exert efforts to overcome a contingency by sound seamanship. The difficulty with following Allied's contention that paragraph 11 provides a basis for liability is that the proviso upon which Allied relies applies only to matters mentioned in paragraph 11, and aside from the proviso, the paragraph itself imposes no liability. Of course, Allied's position would be sound if the proviso had been written "Nothing contained in *this agreement*"

shall relieve GATCO from the consequences of neglect, etc., or the failure to exert efforts to overcome a contingency by sound seamanship.

Allied's third claim for damages arose in July 1961 when the JUMBO was carrying salt cake from Claymont, Delaware to Jacksonville, Florida. Three times the JUMBO was grounded. A plate was fractured and the salt cake was damaged by sea water. GATCO contends that the movement of the salt cake was made pursuant to the provisions of a contract of April 29, 1960. This contract required suit to be brought within six months for claim for cargo damage. Suit was not brought within this period and GATCO seeks exoneration for this reason. GATCO'S position is without merit.

The contract of April 29, 1960 covered shipments only during 1960. It was not expressly or impliedly renewed or extended to cover the July 1961 shipment.

The July 1961 shipment was made pursuant to an oral charter. An employee of Allied phoned the Norfolk office of GATCO and asked for a barge to move the salt cake. Neither he nor the employee of GATCO with whom he talked had authority to contract on behalf of their companies.

The GATCO employee sent a teletype to GATCO'S Jacksonville office, reporting the request for a barge and asking: "Will same rate and terms apply as last trip?" The last trip had been made pursuant to the contract of April 29, 1960. GATCO'S officer at Jacksonville replied: "Rate will be the same as before—$5.00 per ton."

The barge was loaded and dispatched without further negotiations. GATCO first billed on the basis of short tons. Allied pointed out that the previous rate set forth in the agreement of April 29, 1960 was based on long tons. GATCO then billed on the basis of long tons. This was consistent with its oral charter which specifically provided that the rate should be the same as the last movement under the written charter. It does not follow, however, that all of the terms of the written charter applied. The Court finds that the salt cake was moved on an oral charter at $5.00 a long ton. The oral charter contained no limitation for the assertion of a claim. GATCO, the Court concludes, is liable for the damage to the salt cake.

The Court requests proctors for GATCO to submit a sketch of a decree after circulating it for endorsement.