**BROWN & ROOT, INC., Appellant,**

v.

**AMERICAN HOME ASSURANCE COMPANY, Appellee.**

No. 21766.

United States Court of Appeals Fifth Circuit.

Nov. 23, 1965.

Rehearing Denied Dec. 29, 1965.

114

Robert Eikel, Houston, Tex., for appellant.

Carl G. Stearns, E. V. Greenwood, Houston, Tex., for appellee.

Before BROWN and COLEMAN, Circuit Judges, and MORGAN, District Judge.

JOHN R. BROWN, Circuit Judge:

This case concerns the liability of a tug for loss and damage to deck-loaded cargo when the barge went aground on March 26, 1956, nearly a decade ago. As such, the cast of nautical characters is a replica of our earlier decision involving the Tug R. A. Turrentine, the Barge LTC 6 and the Magnet Cove interests.[1] The R. A. Turrentine v. American Home Assur. Co.,[2] 5 Cir., 1960, 279 F.2d 811, 1960 AMC 1429, cert. denied, 364 U.S. 914, 81 S.Ct. 278, 5 L.Ed.2d 228, rehearing denied, 364 U.S. 944, 81 S.Ct. 458, 5 L.Ed.2d 375.

Indeed, so the Tower[3] argues, this identity as to names, the underlying relation of the parties, the nature of the towing/transportation agreement was so stressed by cargo claimants that the trial Judge, perhaps mesmerized by this strange coincidence, was led to apply a sort of res judicata-collateral estoppel even though the operative occurrences —here a grounding in a channel and in the previous case a capsizing in a bay —were utterly different, calling for quite distinct legal theories of responsibility. This leads the Tower to attack the trial Court's finding of negligent grounding as clearly erroneous because not supported on the facts of this record. If this ground fails, it repeats its contentions unsuccessfully urged in the prior case that under the arrangement the Tug Owner was engaged in transportation, not mere towage, enabling it, first, to become the beneficiary of a bill of lading contract and, then, as a private carrier under it, to claim the benefit of the Harter Act and its error-in-navigation exemption, 46 U.S.C.A. § 192. By independent review of the first attack and stare decisis as to the second, we reject them and affirm.

We start out by agreeing fully with the Tower that under no circumstances may the earlier decision have any bearing on the Tug's responsibility for the dissimilar occurrence of March 26, 1956, here in suit. Apart from the Harter Act contentions arising out of the basic contractual arrangement, the Tug's legal liability turns on whether the Tug was negligent in respect of the grounding at this time, place and on this record, not the former one. We may agree also that the evidence is thin, but thin as it

---

1. Magnet Cove Barium Corp. (Shipper-Consignee); Magobar, Inc. (cargo-owner); and Magco Towing Co., Inc. (the nominal carrier issuing the bill of lading).

2. Although an earlier case as it hit the Courts and books, this involved a subsequent incident in June 1956 occurring in Corpus Christi Bay. There an attempt to shift the tug ahead of the barge after a towing cable parted resulted in the barge listing and the cargo going overboard.

3. Brown & Root, Inc. was the owner of the Tug R. E. Turrentine. We use the term "Tower" in a conventional operational sense with no overtones as to the status of such "Tower" as one engaged in transportation of the cargo rather than simple towage. This issue is discussed later.

may be, it is thick enough considering our separate role. Cf. Hughes Tool Co. v. Varel Mfg. Co., 5 Cir., 1964, 336 F.2d 61, 62.

The Barge LTC 6 with a 900-ton deckload of drilling mud, much in large steel containers and the remainder in pallet-stacked bags, departed from Brownsville bound for Corpus Christi by the Intracoastal Canal. The Tug was made up astern to push the Barge. All went well until about 10:00 p. m. The wind had been from the north, but then shifted to the northeast. As the tow, northbound, passed the channel mile post 620 and was between U. S. Engineer Nos. 306 and 307, the port forward corner of the Barge went aground on or near the left (upbound) channel bank. Either this or the Tug's efforts to slide off the strand, or a combination of both, caused the deck cargo to shift, listing the Barge more sharply to starboard with 90% of the cargo sliding into the canal.

According to the Tug's Captain (Savoy) testimony both in pretrial deposition and on his later court appearance, the Barge struck an unmarked, unknown shoal within the defined limits of the navigable channel. The shoal presumably had been formed through surface drainage of soil off the nearby cut banks. On this hypothesis, the Tower could then argue forcibly those cases which exonerate the Tug from striking an unknown, unmarked object in the channel. Exner Sand & Gravel Corp v. Gallagher Bros. Sand & Gravel Corp., 2 Cir., 1946, 157 F. 2d 291, 1946 AMC 1449; The I.L.I. No. 103, 2 Cir., 1939, 104 F.2d 650, 1939 AMC 927; The Arlington, 2 Cir., 1927, 19 F.2d 285, 54 A.L.R. 101, 1927 AMC 900. This theory got a substantial boost from an unexpected quarter. A marine surveyor, Dierlam, retained by and acting for the cargo underwriter (who is the subrogated libellant here) went to the scene of the casualty. His initial formal report to his principles stated that the "barge was found to be grounded on a silt or sand formation which, apparently, had built up on the edge of the west side of the channel bank from land drainage." The shipper-cargo owners in submitting proof of loss to the underwriter (libellant-appellee here) described the occurrence in similar terms. The " * * * barge LTC #6 * * * was stranded at about mile 620 in between markers 306 and 307, intracoastal waterway, the barge struck sand bar on the left side of the canal and went hard aground. * * *." But by trial time Surveyor Dierlam had changed his mind, primarily as a result of a study of the U.S. Engineer cross sections for stations 306 through 307. These cross sections (at 50-foot intervals) were prepared from soundings in August 1956, some four to five months after the stranding during which time it was undisputed no dredging had been done. Contrary to Tower's claim, these showed no shoal out into the defined channel limits.

 Without a doubt the actions and reports of the Surveyor Dierlam, made by one whose job was to investigate and *report*, constituted admissions to prove the truth of the declarations made.[4] But except for those specialized, rare assertions characterized as judicial admissions, a party is entitled to explain an admission and even to retract it. When that is done, the factual evaluation of the admission *vis-a-vis* explanation, retraction, or repudiation, is for the trier of the fact.

 In that process many things are pulling in different directions here. Thus, for example, the Tower rightly emphasizes the interval nature of cross section soundings and the inability of them to portray accurately in detail the whole contour of the channel limits and bottom.

4. See, e.g., Compagnie De Navigation Fraissinet & Cyprien Fabre, S. A. v. Mondial United Corp., 5 Cir., 1963, 316 F.2d 163, 171 n. 10; Employers Mut. Cas. Co. v. Mosqueda, 5 Cir., 1963, 317 F.2d 609, 612–613; Local Union No. 787, International Union of Elec. & Mach. Workers v. Collins Radio Co., 5 Cir., 1963, 317 F.2d 214, 219 n. 10; Cox v. Esso Shipping Co., 5 Cir., 1957, 247 F.2d 629, 632–634, 1957 AMC 1927. See generally McCormick, Evidence § 244 (1954).

This infirmity is augmented because fixing of the location of the casualty in terms of stations 306–307 is at best an estimate. But most significant, Surveyor Dierlam's job was to ascertain cause, both in an operational and legal sense, and after full opportunity to make full inquiry on the scene, he accepted without reservation the Tug's story. On the other hand, strong factors offset or overcome these considerations. One, of course, is the burden resting on the Tug to come forward with a plausible explanation for having stranded during calm weather on a clear night in a waterway having over 150 feet of navigable channel. Bisso v. Waterways Transp. Co., 5 Cir., 1956, 235 F.2d 741, 744, 1956 AMC 1760, 1763. The Captain was, to be sure, adamant in his testimonial insistence that he was not out of the channel. But the trier was entitled to make something more out of his statements given to Surveyor Dierlam on the spot. After first stating that the Barge "nosed close enough to the channel bank that she struck a sand bar on the lefthand side (going north)," the Captain spoke as the voice of the Tower [5] in expressing the fact-conclusion "I believe this casualty occurred because there were insufficient channel lites to help me keep in the center of the channel." The Captain insisted, of course, that reference to "the lefthand side" meant within the channel limits. But when asked on the trial to estimate how far the Tow was from the center of the channel when the port corner of the Barge touched ground, he could give no estimate. And critical as it was to exculpate a Tow which grounded in calm, clear conditions in a channel of abundant depth and width, Bisso v. Waterways Transp. Co., supra, there was a complete failure to make any soundings of any kind at the scene of the casualty while Tug, Barge, Captain, and Surveyor were all there. The trier of the fact was entitled to conclude that the Captain tipped off the real reason for the grounding in his complaint about channel lights. That statement revealed that in the Captain's own mind he must have strayed too far from the center. It did not reveal—nor could it—how the existence of channel lights could have revealed a shoal which was completely submerged and wholly undisclosed. The point of this is not, as asserted by Cargo, that the failure of the Tow to navigate in the center of the channel was an independent ground of negligence. Rather, it is that the farther the tow was from the center, the closer it was to the edge of the defined channel, the exact location of which was difficult, if not impossible, to locate on the surface of the waterway. The permissibility of this inference is cumulatively supported by ample evidence of other fault, particularly with respect to the failure to maintain a proper lookout considering the high deckload.

Affirming, as we do, the finding of negligent towage, the alternate Harter Act error-in-navigation defense, based on identical facts between identical parties, involves the identical question disposed of in our former decision.[6] The Tower urges that we reconsider.

In this undertaking which perhaps reckons with a mixture of the law-of-the-case principle, Lincoln Nat'l Life Ins. Co. v. Roosth, 5 Cir., 1962, 306 F.2d 110 (en banc), and stare decisis, the Tower with a good deal of basis throws added doubt on the correctness of our still earlier decision in Mississippi Valley Barge Line Co. v. T. L. James & Co., 5 Cir., 1957, 244 F.2d 263, 1957 AMC 1647, cert. denied, 355 U.S. 871, 78 S.Ct. 121, 2 L.Ed.2d 76, on which The R. A. Turrentine was based. To the doubts generated by Chief Judge Tuttle's special concurrence, 279

---

5. Fall v. Esso Standard Oil Co., 5 Cir., 1961, 297 F.2d 411, 417, 1962 AMC 951, 959, cert. denied, 1962, 371 U.S. 814, 83 S.Ct. 24, 9 L.Ed.2d 55; June T., Inc. v. King, 5 Cir., 1961, 290 F.2d 404, 406, 1961 AMC 1431, 1433.

6. The R. A. Turrentine v. American Home Assur. Co., 5 Cir., 1960, 279 F.2d 811, 1960 AMC 1429, cert. denied, 364 U.S. 914, 81 S.Ct. 278, 5 L.Ed.2d 228, rehearing denied, 364 U.S. 944, 81 S.Ct. 458, 5 L.Ed.2d 375.

F.2d 811, 815, the Tower adds supposedly contrary results reached in these cases: Continental Grain Co. v. American Commercial Barge Line Co., 7 Cir., 1964, 332 F.2d 26, 1964 AMC 1830; Allied Chemical Corp. v. Gulf Atlantic Towing Corp., E.D.Va., 1964, 244 F.Supp. 2, 1965 AMC 776; Pure Oil Co. v. M/V CARIBBEAN, W.D.La., 1964, 235 F.Supp. 299. And to these we think the action of the Supreme Court in Southwestern Sugar & Molasses [7] saps pretty generally whatever vitality remained in T. L. James so far as the status of carrier versus tower turned on independent ownership of the tug and of the barge being physically towed. In each case the barge was shipper-owned and the ICC tariffs of these regulated certificated carriers treated the resulting cargo liabilities specially. In T. L. James we held, in effect, such exoneration to be void as a matter of law. In Southwestern Sugar & Molasses, the Supreme Court affirmed our decision [8] that validity was a matter first to be determined by the ICC under the primary jurisdiction doctrine.

■■ But to recognize that the signal from T. L. James is weak does not carry the day. At the outset, this loose, informal, oral arrangement revealed by the facts of these two identical records does not compel a holding by the trier of fact, cf. F.R.Civ.P. 52(a), that the Tower undertook to accept and perform all of those obligations and responsibilities characterizing a carrier,[9] i. e., one engaged in the transportation of cargo as distinguished from the more limited role of supplying towage.

■■ More important, even making the double assumption that the arrangement gave Tower the status of a carrier and that it was therefore an implied party to the bill of lading issued by Magco Towing Company is insufficient. The Harter Act is not self-executing. For private carriage it must be invoked and admittedly that was done here, if at all, through incorporation by reference. We adhere to our former holding that the incorporating condition "if this is a rail or rail-water shipment" was not met by an *all*-water movement. See 279 F.2d 811, 814. This is but an application of the familiar principle that in the absence of a contrary contractual provision, the law holds one engaged in private carriage to the traditional standard of due care. No paper—no contract —to which Tower was a formal or implied party undertook to alter this standard. It, first, failed somehow to make itself a third-party beneficiary to Magco Towing Company's contract. More than that, Magco Towing Company's contract did not prescribe the less exacting standard as such. It only incorporated the Uniform Bill of Lading—a document designed for ICC certificated rail carriers and their liabilities for shipments moving partly by water. 49 U.S.C.A. § 1(1) (a).

The Tower failed to establish to the satisfaction of the trier of the fact that it had in fact invoked the Harter Act in the contractual arrangement between the parties. The Harter Act defense therefore fails.

■ This leaves the tag-end attack on the allowance of surveyor's fees and expenses to Surveyor Dierlam in the amount of $841.57. Although the record is technically deficient perhaps in giving this item the true status of a subrogation claim since the Libellant-Appellee paid it direct to Surveyor Dierlam, we think

---

7. Southwestern Sugar & Molasses Co. v. River Terminals Corp., 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334, 1959 AMC 1631, affirming in part and remanding in part, 5 Cir., 1958, 253 F.2d 922, 1958 AMC 1534. For opinion on remand see 5 Cir., 1960, 274 F.2d 36, 1960 AMC 2064.

8. 253 F.2d 922, 1958 AMC 1534.

9. Ownership of transportation facilities is seldom a decisive factor, cf. Agricultural Transp. Ass'n v. King, 5 Cir., 1965, 349 F.2d 873.

in view of the equitable nature of the doctrine of subrogation that this deficiency can be remedied on the remand required in connection with this small part of the claim. The Tower is correct that in so far as Surveyor Dierlam was acting solely in behalf of the Carrier Underwriter's interests, the fee in connection with a cargo claim is not allowable.[10] But to the extent that Surveyor Dierlam's actions and expenses were reasonably attributable to the action of a prudent uninsured cargo owner in the care, protection, and salvage of the cargo lost or damaged, it certainly ought to be allowed.[11]

This brings to mind what we said in Bros Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1963, 320 F.2d 594, 597: "Hearkening as we should to the principle epitomized in Justice Story's apothegm that 'It is for the public interest and policy to make an end to litigation * * *' so that '* * * suits may not be immortal, while men are mortal' * * * we nonetheless conclude that before the curtain falls on this juridical drama, there must be another act." Now this old, old case must go back for yet another round on this very, very limited issue. Indeed, judging from the past, it might be rounds, not round.[12]

But hastening the day when, as it "must to all living things, an end comes to this case * * *,"[13] we expresssly affirm the District Court's allowance of all items of damages—except the surveyor's fee—with interest. As to the surveyor's fee, the case is reversed and remanded for further, consistent proceedings and for the entry of a proper decree with interest.

Affirmed in part and reversed and remanded in part.

---

10. Tower urges these cases: Galveston Towing Co. v. Cuban S.S. Co., 5 Cir., 1912, 195 F. 711, 714; The Venus, S.D. N.Y., 1883, 17 F. 925, 928; The Benjamin A. Van Brunt, E.D.Pa., 1925, 3 F. 2d 655, 65S; The Priscilla, 1 Cir., 1932, 55 F.2d 32, 37, 1932 AMC 334, 335.

11. Cargo urges these cases: The James McWilliams, 2 Cir., 1930, 42 F.2d 130, 1930 AMC 1055; Cargill, Inc. v. The Frank, A. Lowery, N.D.N.Y., 1957, 159 F.Supp. 133, 1957 AMC 1563, aff'd, 2 Cir., 1958, 251 F.2d 845, 1958 AMC 842, cert. denied, The Ellen S. Bouchard v. Cargill, Inc., 356 U.S. 951, 78 S.Ct. 917, 2 L.Ed.2d 845; The Raleigh, D.Md., 1943, 50 F.Supp. 961, 1943 AMC 1016; The Feltre, D.Ore., 1939, 1939 AMC 1173; Mulqueen v. Hedger Transp. Co., S.D. N.Y., 1933, 1935 AMC 1247, 1248.

12. After our remand in The R. A. Turrentine to determine whether the Tug should be compensated for hire, we again had the case on the Tower's unsuccessful appeal from the District Court's allowance of interest from date of the decree. Brown & Root, Inc. v. American Home Assur. Co., 5 Cir., 1963, 321 F.2d 814, 1964 AMC 69.

13. Bros Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1965, 351 F.2d 208 [decided September 14, 1965].