CHESAPEAKE BAY BRIDGE & TUNNEL DISTRICT, Plaintiff,

v.

OIL SCREW PRINCE, Official No. 130847, and her appurtenances, in rem, and her owner, Harry A. Hays, in personam; and the BARGE NL–5, Official No. 253855, and her appurtenances, in rem, and Nilo Barge Line, Inc., a corporation, in personam, her owner, Defendants.

NILO BARGE LINE, INC., a corporation, as owner and operator of the Barge NL–5, Plaintiff,

v.

TUG PRINCE, her engines, tackle, etc., in rem, and Harry A. Hays individually and T/A Hays Tug and Launch Service, as owner and operator of the Tug Prince, in personam, with clause of foreign attachment, and Craig Brothers Marine Railway, Inc., garnishee, Defendants.

In the Matter of the Complaint of Harry A. HAYS, individually and T/A Hays' Tug and Launch Service, as owner of the Tug Prince, for exoneration from or limitation of liability in a cause of limitation of liability, civil and maritime.

CHESAPEAKE BAY BRIDGE & TUNNEL DISTRICT, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 6065, 6071, 6081, 6247.

United States District Court
E. D. Virginia,
Norfolk Division.
May 9, 1968.

Hugh S. Meredith and Braden Vandeventer, Jr., Vandeventer, Black, Meredith & Martin, Norfolk, Va., for Chesapeake Bay Bridge & Tunnel District.

Robert M. Hughes, III, Seawell, McCoy, Winston & Dalton, Norfolk, Va., for Harry A. Hays.

C. V. Spratley, Jr., Norfolk, Va., for the United States.

Roy L. Sykes, Jett, Sykes & Berkley, Norfolk, Va., for Nilo Barge Line, Inc.

## MEMORANDUM

MacKENZIE, District Judge.

At 8 o'clock A.M. on the morning of March 16, 1967, the Barge NL–5, only minutes adrift from the Tug PRINCE, struck the concrete pilings supporting a portion of the raised roadway of the Chesapeake Bay Bridge Tunnel complex, causing considerable damage to both the bridge and the barge.

The ill-fated voyage had originated at Curtis Bay, Maryland, at 1 o'clock A.M., March 15, 1967, where the PRINCE had picked up the NL–5 under a contract to tow the barge laden with 1800 tons of sulphuric acid to a fertilizer concern near Norfolk, Virginia. Under the stress of heavy weather and other circumstances, all of which are commented on in some detail in the findings and conclusions which follow, the unmanned Barge NL–5 became separated from the Tug PRINCE.

The United States Coast Guard Tug MOHICAN, summonsed hurriedly to the scene, and attempting to assist when the barge went adrift, unsuccessfully attempted to avert the casualty. The barge was cast upon the pilings of the bridge.

Suit was instituted by Chesapeake Bay Bridge and Tunnel District against the Tug PRINCE, and her owner, Hays, also against the Barge NL–5, and her owners, Nilo Barge Line, Inc., and in another, suit against the United States. Nilo Barge Line, Inc. filed its suit against the Tug PRINCE and her owner, Hays. Hays filed his timely petition for exoneration or limitation of liability. All of the causes were merged and heard by the Court on January 23, 24, 25, and 26, 1968.

## FINDING OF FACTS

1. At the time of the casualty the Tug PRINCE was owned by Harry A. Hays, as a proprietor. The vessel was

81.2 feet long, had a beam of 20.1 feet, drew 9.2 feet, was of 112 gross tons and was powered by a Model 12–567, General Motors diesel engine, 12 cylinders, 900 horsepower.

2. The Barge NL–5 was owned by Nilo Barge Line, Inc., of Wilmington, Delaware, was 215.3 feet long, had a beam of 44.1 feet, drew 15.7 feet, was of 1250 gross tons, was loaded with 1800 tons of sulphuric acid, and was unmanned and so certificated by the United States Coast Guard, at the time of the casualty.

3. The bridge was and is owned and operated by the Chesapeake Bay Bridge and Tunnel District, a political subdivision of the Commonwealth of Virginia. By virtue of the requisite permits from the United States Army Corps of Engineers, the bridge has a right to be where it is, stretching across the mouth of Chesapeake Bay in a north-south direction, just inside Cape Henry and Cape Charles, Virginia.

4. The United States Coast Guard Cutter MOHICAN was and is a public vessel of the United States 110 feet long, with a beam of 27 feet, drew 11.3 feet, and is powered by a diesel engine of 1000 horsepower.

5. The crew of the Tug PRINCE at the time of the casualty, numbering five (5), consisted of a Captain (unlicensed), a Mate (unlicensed), two Engineers, and a Deckhand with three weeks' experience. The Barge NL–5 was unmanned.

6. To support the towing operations of the Tug PRINCE, the vessel was equipped at the time of the casualty with 7 inch nylon towing hawser 1200 feet in length and a stern capstan which was inoperative on March 16, 1967, and had been so inoperative, with the owner's knowledge, for several weeks.

7. At 1 o'clock A.M., March 15, 1967, the Tug PRINCE made up with its port side to the starboard side of the Barge NL–5, at Curtis Bay, Maryland, and the flotilla thus proceeded southerly, and uneventfully, down Chesapeake Bay, to reach a point one (1) mile due east of Wolf Trap Light at 8:45 o'clock P.M., same date.

8. Earlier that same evening, the radio broadcast by the Wilmington commercial marine operator, which message was received aboard Tug PRINCE, indicated small craft warnings would be effective at 9 o'clock P.M., with north to northwest winds increasing to 20 to 30 knots.

9. At 9:30 o'clock P.M. with the flotilla abeam of the mouth of the York River, Captain Hutchinson talked via radio telephone with Mr. Hays, owner, reporting everything in order, winds northwest 15 to 25 miles per hour, expected arrival time at Norfolk, Virginia, at 2:30 o'clock A.M., March 16, 1967.

10. At 11:30 o'clock P.M., March 15, 1967, at Buoy "A", in lower Chesapeake Bay, approximately six (6) miles northeast of Thimble Shoals Light, which would normally have been reached in one (1) hour, the weather broke sharply, the wind swinging to the northwest and rising quickly to more than 25 miles per hour. This caused the tug and barge to surge together and necessitated changing the tug to the port side of the barge.

11. The wind continued to quicken, the maneuver to the port side of the barge afforded no relief, and the decision was made by Captain Hutchinson to put the barge astern on a hawser. The mate, Hazel, at some risk, boarded the barge, but succeeded in making the towing bridle fast only to the bit on the port bow of the NL–5, and was unsuccessful in attaching the other end of the bridle to the starboard bow bit. Normal towing procedure would have had the bridle stretched across the bow of the barge with the hawser attached to the center thereof.

12. During the transfer of the barge from one side of the tug to the other and the subsequent streaming of the barge astern, the tug and barge slammed together causing a crack in the hull of the Tug PRINCE. This crack was above the normal waterline and while some water came in, nevertheless, it was not reported to the captain until two (2) hours

later. While the crack was not a real threat of danger, it participated in the uproar of the emergency.

13. While the mate was aboard the NL-5 to attach the towing hawser he did not consider dropping either of the two anchors with which the NL-5 was equipped. Neither the mate nor the captain of the Tug PRINCE had been instructed as to the use of the anchors aboard the NL-5 nor did either (nor anyone on board) know how to let go the anchors.

14. The mate estimates the length of the hawser streamed from the tug to the barge as 200-250 feet; the Coast Guard personnel aboard CGC MOHICAN estimated the length of the hawser when they saw it later as 500 feet; the Captain of the PRINCE estimated the hawser in use at 1000 feet.

15. A 7 inch nylon hawser, by commercial standards, wet, weighs 135 pounds per 100 feet.

16. The Tug PRINCE from 11:45 o'clock P.M., March 15, 1967, until it reached Thimble Shoals Light at 2 o'clock A.M., March 16, 1967, travelling southwest and with the wind on the beam, made good only about two (2) miles over the bottom, and when it turned westward at the light and took the wind and sea on the starboard bow and beam, the PRINCE was unable to make any headway and, in fact, was losing ground to the southeast.

17. Shortly after 2:30 o'clock A.M., the PRINCE sent an emegency call to the Coast Guard. A small cutter, CAPE CURRENT, responded, but was ineffective. The Navy Tug 535 arrived but was likewise ineffective. At 5:57 o'clock A.M. the larger cutter MOHICAN, a Coast Guard Tug, arrived at the flotilla, then on the south side of Thimble Shoals Channel, 4 miles east and down wind of Thimble Shoals Light, and approximately 3½ miles west and windward of the Chesapeake Bay Bridge Tunnel Trestle "A".

18. At 6 o'clock A.M., March 16, 1967, and for the next hour, the winds were estimated by Mate Hazel of the PRINCE at 50 miles per hour, seas, 30 feet high; by Captain Hutchinson of the PRINCE, winds, 75 miles per hour, seas 30 feet, by the MOHICAN as, winds in excess of 50 knots, seas, 8-12 feet.

19. By garbled radio exchange it was agreed the MOHICAN would try to take over the PRINCE'S tow by sending over a messenger line to which the bitter end of the PRINCE'S nylon hawser would be made fast. After the end of the hawser was aboard the MOHICAN and secured, the hawser aboard the PRINCE would be released.

20. After one unsuccessful attempt, a heaving line was finally passed from the MOHICAN to the PRINCE. Captain Hutchinson of the PRINCE, without hauling in the heaving line (which he described as a "clothes line") and retrieving the messenger (a larger line attached to the heaving line), quickly tied the heaving line (without waiting for the larger line) to the end of the towing hawser and released the entire hawser from the towing bit of the Tug PRINCE. The heaving line snapped before the hawser could be hauled aboard the MOHICAN, and thus at 7:15 o'clock A.M. the Tug PRINCE and Barge NL-5 were separated. The barge was adrift approximately one mile west of the Bridge.

21. A request from the MOHICAN for the PRINCE to buoy the end of the hawser apparently was not received and was not done. Efforts by the MOHICAN to retrieve the hawser were unsuccessful.

22. At the last minute the MOHICAN managed to "lasso" a bit on the stern of NL-5 with a four inch hawser from the bow of the MOHICAN which backed down full but could not stem the drift of the barge to the east and when about 300 yards from the bridge trestle, the MOHICAN cast off to keep itself from being dragged into the bridge.

23. The estimates of damage to the Bridge was tendered at $165,000.00 and to the Barge at $80,000.00.

## CONCLUSIONS OF LAW

■ 1. The Chesapeake Bay Bridge and Tunnel District has not seriously pursued its complaint against the United States and in its argument and post trial brief has omitted any reference thereto. Indeed, it appears that there is no evidence before this Court of any negligence on the part of the United States Coast Guard.

Accordingly, in. Civil Action No. 6247, Chesapeake Bay Bridge and Tunnel District v. United States of America, judgment will be entered in favor of the United States.

In such cases, to render the Coast Guard liable for its attempted role as salvor, unsuccessful though it was, evidence of gross negligence or willfulness would have been necessary. The casualty here suffered would most certainly have occurred had not salvage been undertaken to extricate the barge from the peril to which it was already exposed. Frank v. United States, 250 F.2d 178 (7 Cir. 1957) ; The Noah's Ark v. Bentley & Felton Corp., 292 F.2d 437 (5 Cir. 1961) ; Tisdale v. United States, 1963 AMC 2662; The S. C. Schenk, 158 F. 54 (6 Cir. 1907).

The Coast Guard Cutter, MOHICAN, responded to an emergency call for assistance and presented itself, in winds just short of hurricane force, in shallow water, in a corner, so to speak, two miles from the beach on the south and two miles from the bridge, under which it could not pass, to the east. Into these obstructions the vessel was being blown by a 50 knot full gale from the northwest. Under such circumstances even the experts who would suggest some other maneuver agree that the procedure adopted must be left to the captain who is on the scene. No evidence of negligence has been shown.

■ 2. Judgment will be entered in favor of NL–5 and Nilo Barge Line, Inc. in the claim asserted against them by Chesapeake Bay Bridge and Tunnel District in Civil Action No. 6065.

In this case the NL–5 was unmanned and was so certified. A certificate of inspection attesting to the sufficiency of the barge and its equipment for towing, unmanned, was issued on January 6, 1966. No change in or deterioration of that status has been suggested by any contestant. No evidence of negligence attributable to the barge or its owner has been offered.

" * * * But whenever the tug, under the charge of her own master and crew, and in the usual and ordinary course of such an employment, undertakes to transport another vessel, which, for the time being, has neither her master or crew on board, from one point to another, over waters where such accessory motive power is necessary or usually employed, she must be held responsible for the proper navigation of both vessels; and third persons suffering damage through the fault of those in charge of the vessels must, under such circumstances, look to the tug, her master or owners, for the recompense which they are entitled to claim * * *." Sturgis v. Boyer, 65 U.S. (24 Howard) 110, 16 L.Ed. 591 (1860). This remains the law, Tebbs v. Baker-Whiteley Towing Co., 271 F.Supp. 529 (D.C.Md.1967).

■ 3. The petition of owner Hays for exoneration or limitation will be DENIED.

A tug of the characteristics of the PRINCE for use in a towing operation such as here contracted for would require, most assuredly, that all major mechanical equipment serving to implement the very limited crew complement, such as the capstan on the Stern, should have been in good working order.

This was a trip to tow a steel barge 215 feet long, drawing 15 feet of water, of 1250 net tons and loaded with 1800 tons of sulphuric acid, down the entire unprotected length of the Chesapeake Bay. The tow could encounter (and in fact did) almost any variation imaginable in the spectrum of weather. There was considerable evidence from every source that particularly in the actual

area which was the scene of this casualty, lower Chesapeake Bay, that the sea could be very fickle indeed. There was only one deckhand aboard who was on his first voyage of any significance and was totally inexperienced. On the nights of March 15–16, 1967, he was of little use both because of seasickness and because in this emergency the captain could ask little of a deckhand who had only three weeks training. Other tug captains, testifying for Hays, indicated that at least two, and more likely, three deckhands should be included on trips such as that undertaken here.

But even giving the benefit of this doubt of crew deficiency to Hays, the casualty serves to succinctly point up the unseaworthy condition created by the inoperative capstan, a fact known to the owner for several months. Had the capstan not been aboard at all, one could assume that the capabilities of the PRINCE and the number of crewmen necessary to operate the vessel for towing without the mechanical contrivance might have been stabilized since her launching in 1899. On the other hand, it is a reasonable inference that the presence of the capstan to mechanically handle the hawser and the tow went a long way in determining that only one deckhand need be included in the crew complement. It is also a reasonable inference that the inoperative status of the capstan to handle 1200 feet of wet, slippery, heavy nylon hawser on a very unsteady platform, had considerable bearing in the decision to tow alongside, a practice which every expert, including those testifying for Hays, frowned on for the trip down Chesapeake Bay. And it is not too far afield to muse that had the tow been streamed astern at the start of the trip, as every other tug captain thought to be the correct procedure, then the crack in the hull and the allied crisis of putting the tow out on the hawser in bad weather would not have sapped the reserve of the few crewmen available for the trial that was to come. The barge would have likewise been in proper towing posture and not, as was the case,

with the bridle improperly attached in haste only to the bit on the port bow. Likewise the short length of hawser employed (a bad practice), estimated by Mate Hazel, the man who put it out, to have been 200 feet, could be attributed to the effort at handling the heavy hawser without the capstan and particularly in its retrieving.

Finally, the lack of the capstan, most assuredly contributed to the comic opera negligence displayed when Captain Hutchinson tied the small heaving line to the end of 1200 feet of hawser, to which was attached 2000 tons or more of steel barge and sulphuric acid, and threw it off to be hauled in by the MOHICAN. Here the lack of the capstan, to slack off or to heave in the hawser and barge, or to heave in a heavier line from the MOHICAN, or, at least, to hold all of this to allow Captain Hutchinson to approach the problem with more confidence, is most aptly demonstrated.

That Hutchinson's handling of the attempted transfer of the barge to the MOHICAN was negligence is without question and would preclude exoneration. The unseaworthy condition of the PRINCE with its capstan out of service, a fact known to the owner, likewise would preclude limitation.

4. Judgment will be entered for Chesapeake Bay Bridge and Tunnel District against Tug PRINCE and Harry A. Hays, owner, Civil Action No. 6065, and judgment will be entered for Nilo Barge Line, Inc. against Tug PRINCE and Harry A. Hays, owner, Civil Action No. 6071, as a result of the negligence of the captain and crew of the Tug PRINCE, and upon the patent unseaworthy condition of the tug, as elsewhere recounted herein, all of which proximately caused and contributed to the damages to the bridge and barge.

■ The Tug PRINCE, through the action of Captain Hutchinson, was guilty of negligence in the handling of the attempted exchange of the towing hawser from PRINCE to MOHICAN. In addition the Tug PRINCE, and its crew, when they undertook the towage of this

unmanned barge, which had no source of motive power, assumed a dominate position with regard to the Barge, The Rebecca, 152 F.2d 607 (4 Cir. 1945), and thereby became responsible to exercise reasonable care for the protection and safekeeping of the tow so entrusted to them. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932), Southgate v. Eastern Transportation Co., 21 F.2d 47 (4 Cir. 1927), The Raleigh, 50 F.Supp. 961 (D.C.D.Md. 1943). To so proceed, with this duty imposed by law, without inspecting the anchors and allied equipment of the NL–5, without exploring its anchoring potential, and without anyone on board the tug who was familiar with, or knew how to operate such anchor gear is further negligence of the first magnitude. The unseaworthy aspects of the inoperative capstan have been fully discussed elsewhere.

5. Unless the parties can agree among themselves as to the actual damages suffered, and upon the matter of indemnity for expenses and attorneys' fees as requested by Nilo Barge Line, Inc., within sixty (60) days from the date of this memorandum, these matters will be the subject of further hearing by the Court, or will be referred to a Special Master for determination.